961 P.2d 425 (1998)
I.J.D., Appellant,
v.
D.R.D., Appellee.
No. S-8309.
Supreme Court of Alaska.
July 31, 1998.
*426 Peter F. Mysing, Kenai, for Appellant.
Carol A. Brenckle, Kenai, for Appellee.
Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

OPINION
MATTHEWS, Chief Justice.

I. INTRODUCTION

This case involves a custody dispute between I.J.D. (Irma) and D.R.D. (Daniel), the parents of J.N.D. (Joseph).[1] The trial court awarded sole legal and primary physical custody of Joseph to Daniel with limited visitation to Irma. We affirm the award of custody to Daniel but vacate the visitation award to Irma and remand for reconsideration.

II. FACTS AND PROCEEDINGS

A. Facts

Irma was previously married to Daniel's younger brother, Dell. In February 1991, when Irma was eight months pregnant with Dell's child, Dell was killed in the Gulf War. Their child, R.N.D. (Rachel), was born in April 1991. Soon after Rachel's birth, Irma moved from Washington to Alaska to be near Dell's extended family. She purchased a home next to Dell's parents.
In November 1992 Irma began a relationship with Dell's older brother, Daniel. Irma and Rachel moved into Daniel's home in June 1993; Joseph was born in March 1994. During this time Irma and Daniel's relationship was volatile, plagued by frequent arguments and mutual domestic violence. Daniel had shared custody of his eleven-year-old son, *427 Adam, from a previous marriage. Eventually, Adam refused to visit Daniel while Irma was present, due to Irma's unpredictable, hostile behavior. Daniel and Irma permanently separated in October 1994 and Irma, along with Rachel and Joseph, moved out of Daniel's home.
Soon after the separation, Daniel began visiting Joseph. Irma initially expressed a preference that Daniel only visit Joseph at her home and in her presence. Eventually, Irma allowed Daniel to take Joseph to his home; however, she continued to exhibit considerable reluctance to expand Daniel's visitation with either Joseph or Rachel. In February 1995 Daniel and Irma had an explosive argument about visitation. This resulted in Irma leaving an answering machine message at Daniel's home that in part said:
[Y]ou may never see the kids again, unless it's accidental at a relative's house or anywhere else. You may not talk to them unless they talk to you first; you cannot talk to them about your house life, period, because they are not part of your life.
After that incident, Irma suspended Daniel's visitation with Joseph.
In June 1995 Irma began a relationship with John. She eventually required Daniel to negotiate and schedule most visits through John, which increased the friction surrounding visitation. Irma began encouraging Joseph and Rachel to refer to John as "daddy" and at one point allowed Joseph to use John's last name. Eventually, Irma refused to allow Daniel any contact at all with Rachel. Irma's relationship with John ended in November 1996.

B. Proceedings

Daniel filed a Complaint for Custody in October 1995, seeking shared legal and physical custody of Joseph and visitation with Rachel, his niece. Irma counterclaimed for sole legal and primary physical custody of Joseph. Daniel then filed a motion seeking interim custody and visitation; Irma opposed and filed a countermotion. The trial court granted Irma's countermotion in November 1995, awarding interim sole legal and primary physical custody of Joseph to Irma and adopting Irma's recommendation that Daniel be allowed one overnight visit every other weekend and "incidental" daytime visitation of two to three hours in duration, two to three times weekly.[2] The trial court then ordered a custody investigation.
In January 1996 Daniel filed a Motion to Clarify Order on Interim Custody. He requested an additional twenty-four-hour visitation period to replace the "incidental" visitation. Daniel complained that John had taken complete control over the visitation schedule and that John interpreted the term "incidental" to mean "accidental" visits at Daniel's parents' home. Daniel also claimed that Irma had violated the interim visitation order. The trial court denied the motion.
Pursuant to the request of Custody Investigator Susan Arth, the court ordered Daniel and Irma to undergo psychological evaluations conducted by Dr. Paul Turner. Dr. Turner observed each parent's interaction with Joseph, conducted clinical interviews, and administered several psychological assessments. Dr. Turner found that Daniel suffered from mild to moderate depression and that Irma suffered from a personality disorder "not otherwise specified" with a clinically significant mixture of histrionic and dependent aspects. He noted that both parents should participate in treatment. Although Dr. Turner observed that Irma and Daniel each had adequate parenting skills to care for Joseph, he concluded that their abilities were impaired by their psychological conditions. Dr. Turner also found that Daniel appreciated the significance of maintaining a relationship between Irma and Joseph, but that Irma had difficulty appreciating Joseph's needs and allowed her anger and hostility to interfere with Daniel's relationship with Joseph.
Ms. Arth filed the Custody Investigation Report on May 29, 1997. She recommended that the trial court award Daniel sole legal and primary physical custody of Joseph with weekend and holiday visitation to Irma. Ms. Arth emphasized that in the absence of this *428 arrangement, Irma would consistently interfere with Daniel's relationship with Joseph and that Joseph would be "overwhelmed by his mother's dependency needs and fits of anger." She also expressed concern for Joseph's physical well-being if he remained in Irma's care.
The custody trial was held in August 1997. After considering substantial trial testimony in support of both parents, the court awarded sole legal and primary physical custody of Joseph to Daniel. It granted visitation to Irma as outlined in the Custody Report, consisting of three weekends of every four, alternating holidays, and other times as arranged by both parents.

III. DISCUSSION

A. Standard of Review

We will only disturb the trial court's resolution of custody issues if controlling findings of fact are clearly erroneous or if the record shows that an abuse of discretion has occurred. See Zimin v. Zimin, 837 P.2d 118, 123 n. 10 (Alaska 1992). Findings of fact are clearly erroneous when we are left with a definite and firm conviction, viewing the record as a whole, that a mistake has been made. See Duffus v. Duffus, 932 P.2d 777, 779 (Alaska 1997). An abuse of discretion exists if the trial court considered improper factors, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others. See Borchgrevink v. Borchgrevink, 941 P.2d 132, 134 (Alaska 1997).

B. The Trial Court Did Not Err by Awarding Sole Legal and Primary Physical Custody to Daniel

At the outset, we emphasize that the goal in child custody proceedings is to arrive at a decision that promotes the best interests of the child. See McDanold v. McDanold, 718 P.2d 467, 468 (Alaska 1986); S.N.E. v. R.L.B., 699 P.2d 875, 877 (Alaska 1985). The trial court must consider the criteria set forth in AS 25.24.150(c)[3] as well as all other relevant factors. See AS 25.20.060; Evans v. Evans, 869 P.2d 478, 480 (Alaska 1994). The trial court found that factors (c)(1), (2), (5) and (6) weighed in favor of Daniel, while all others were equally balanced.

1. The capability and desire of each parent to meet Joseph's physical, emotional, mental, religious, and social needs

Irma argues that the trial court erred by finding that Daniel was better able to meet Joseph's needs. In support, she points to testimony indicating that she has a three-bedroom home with a large yard, has an income over three times that of Daniel, would enroll Joseph in private school, would involve Joseph in church, has cared for Joseph since birth, and has more effective parenting skills. She also contends that the trial court mischaracterized the evidence by referring to Daniel's depression as "occasional" and "less debilitating" than her personality disorder.
Daniel responds that the trial court's findings on this issue are supported by the testimony at trial, Dr. Turner's evaluations, and Ms. Arth's Custody Report. He contends that the evidence indicated that Irma has *429 difficulty controlling her anger in front of Joseph, has difficulty placing Joseph's needs above her own, and that her psychological problems adversely impacted her ability to care for Joseph. Daniel also notes that, despite any income disparity, he is fully able and willing to care for Joseph.
Contrary to the premise underlying some of Irma's arguments, the trial court determined that both parents were equally capable of meeting Joseph's physical and religious needs. However, the court did conclude that Daniel could better meet Joseph's emotional, mental, and social needs. With respect to AS 25.24.150(c)(1) and (2) the trial court stated:
Each parent can provide for the physical and religious needs of [Joseph] as reflected above and each parent has the desire to meet all of the needs of [Joseph]. But [Daniel] is better able than [Irma] to provide for the emotional, mental and social needs of [Joseph] and has demonstrated these abilities in connection with his parenting of [Adam]. Although [Daniel's] ability to parent is affected by occasional depression, [Irma] suffers from a personality disorder not otherwise specified with histrionic and dependent features. The court finds that [Daniel's] mental and emotional state is much less debilitating than that of [Irma]. Dr. Turner testified that [Daniel's] [sic] personality disorder makes it very difficult for her to appreciate [Joseph's] needs.
We conclude that the trial court's findings are not clearly erroneous. First, although the trial court acknowledged that Irma generally had appropriate parenting skills and that Joseph and Rachel were both healthy, well-adjusted children, it noted that Irma's personality disorder and emotional instability clearly impaired her ability to parent Joseph. Both Dr. Turner and Ms. Arth emphasized that the disorder prevented Irma from appreciating Joseph's needs and from elevating them above her own needs. Ms. Arth expressed concern that Irma's proclivity toward "unprovoked rages" placed Joseph at risk for both emotional and physical harm. Further, both Dr. Turner and Ms. Arth testified that Daniel should have sole legal and primary physical custody of Joseph.
Other witnesses also testified that Irma had difficulty controlling her hostility and that she inappropriately expressed anger in front of Joseph. Jane, Irma's close friend, testified that Irma intentionally tore the foreskin on Joseph's penis to falsely accuse Daniel of child abuse, and that Irma had used excessive discipline on Joseph, especially during toilet training. The trial court found Jane's testimony especially credible given her close relationship with Irma and Jane's change from her earlier position supporting an award of custody to Irma. Further, Daniel's ex-wife testified that Irma had been irrational and violent toward both her and Adam.
Conversely, the reports and testimony indicated that Daniel was balanced, calm and nonaggressive in his parenting duties, and was fully able to meet all of Joseph's needs.
Second, the evidence supports the trial court's observation that Irma's personality disorder did have a greater impact on Joseph than did Daniel's depression. Both Dr. Turner and Ms. Arth concluded that Irma had significant psychological problems that were less amenable to treatment than Daniel's depression. Dr. Turner "described [Irma's] personality disorder as serious and one that would require a lengthy period of therapy before [she] would be able to appreciate the needs of her son [Joseph] and his father [Daniel]." Dr. Turner also noted that Daniel's depression could be situationally related to Daniel's concern over whether he would be allowed to develop a meaningful relationship with Joseph. Irma offered the testimony of psychologist Dr. Kathleen Dinius in rebuttal. Dr. Dinius testified that Irma did not have a histrionic or dependent personality disorder and that Irma's parenting skills had improved. However, the trial court accorded less weight to Dr. Dinius's conclusions because her conclusions were based on minimal clinical observation and Irma's self-reports, and because Dr. Dinius failed to conduct any objective tests or review Dr. Turner's test results.
In light of the entire record, we cannot say that the trial court clearly erred, especially in *430 light of the significant credibility issues at trial. See Evans, 869 P.2d at 480-81 (according substantial deference to trial court's ability and opportunity to assess witness credibility and demeanor); Sheridan v. Sheridan, 466 P.2d 821, 824 (Alaska 1970).

2. The desirability of maintaining stability and continuity

Next, Irma argues that the trial court erred regarding the factor of stability and maintaining continuity. First, she argues that Joseph should have remained in her custody because he has resided with her since he was seven months of age. Second, relying on Craig v. McBride, 639 P.2d 303, 306 n. 9 (Alaska 1982), she suggests that the court should have declined to separate Joseph and his half-sister Rachel.
Daniel responds that it was not in Joseph's best interests to remain with Irma because her mental health negatively impacted her parenting. He argues that this circumstance justifies separating Joseph and Rachel. Moreover, Daniel contends that the custody arrangement facilitates Joseph's relationship with his half-brother, Adam.
The trial court considered the desirability of maintaining continuity, the issue of separating Joseph and Rachel, and the willingness of each parent to foster a relationship between Joseph and the other parent in the same general discussion. As to the factors in AS 25.24.150(c)(5) and (6), it stated:
[Joseph] is three and one-half years old and during his short life has lived almost continuously with his mother and sister, [Rachel]. However, both parents are capable of providing a stable, satisfactory environment. The two most important issues to be addressed by this court in making its custody determination involve evaluation of the effects of separating [Joseph] from his sister, [Rachel], and the desire and relative ability of each of the parties to allow for an open, frequent and loving relationship between [Joseph and] each parent.
As important as continuity is to the best interests of [Joseph], the deprivation that [Joseph] will suffer if he does not reside with his older sister can be ameliorated if [Irma] allows [Rachel] to visit frequently with [Joseph] in the home of [Daniel] or his extended family. The shock of being removed from his mother's home will lessen over time, especially if [Daniel] approaches his responsibilities as custodial parent of [Joseph] with the same wisdom and foresight as he has with [Adam]. On the other hand, the court finds that [Irma], in a large part due to her personality disorder, cannot or will not allow an open and loving frequent relationship to develop with [Daniel]. This the court believes to be true unless and until such time as she has received treatment sufficient to overcome the effects of this disability.
(Footnote omitted.)
Irma's argument that Joseph should remain with her simply because of her status as primary caregiver lacks merit. See Evans, 869 P.2d at 483 n. 4 (disapproving of "a rule giving custodial preference to the primary caregiver" in context of maintaining child's emotional stability). Although Joseph has primarily resided with Irma since a young age, it is apparent that Daniel will make significant efforts to ease Joseph's transition into his home, including encouraging a close relationship with Irma and Rachel. Moreover, Joseph's grandparents have been actively involved in Joseph's care and, along with Daniel's extended family, will likely continue to provide a support network to Daniel, Irma, Joseph, Rachel, and Adam. See McQuade v. McQuade, 901 P.2d 421, 426 (Alaska 1995) ("[S]tability is often a function of parental attitude and not of geography.") (quoting Craig, 639 P.2d at 308 (Rabinowitz, C.J., concurring)). We also note that Joseph will remain in a familiar geographical area, since both parents reside in the same community.
Second, the trial court should give careful consideration to the issue of separating siblings or half-siblings. See Craig, 639 P.2d at 306 & n. 9; Morel v. Morel, 647 P.2d 605, 607-08 (Alaska 1982). Although it is desirable to keep siblings together, no rigid rule prevents separation. Instead, the matter is committed to the trial court's

*431 discretion to best respond to the myriad of factual settings which will invariably arise in custody matters, at all times cognizant that it is the best interests of the child which is the paramount consideration. Though maintaining sibling relationships will typically be in the best interests of the child, cases will undoubtedly arise where the best interests of the chid dictate otherwise.
Craig, 639 P.2d at 306 (footnote omitted). Since Daniel has custody of Adam on a flexible, shared basis, and has indicated his willingness to encourage Joseph's relationship with Rachel, Joseph should be able to sustain close relationships with both siblings under the custody decision. See, e.g., Rooney v. Rooney, 914 P.2d 212, 217 (Alaska 1996) (approving of child's change of residence from mother to father even though it involved "destabilizing effect" where best interests of child served).
Given the foregoing, the trial court's findings as to these factors are not clearly erroneous.

3. The willingness and ability of each parent to foster an open and continuous relationship between Joseph and the other parent

Irma argues that the trial court erroneously found that she would not allow Joseph to develop and maintain a frequent and loving relationship with Daniel. In support, she asserts that she initially encouraged Daniel to visit Joseph shortly after she and Daniel separated and later voluntarily increased Daniel's visitation.
Daniel argues that the evidence showed that Irma frequently and consistently interfered with his visitation and attempted to replace him with John as Joseph's father-figure. Further, Daniel suggests that the evidence demonstrated that he would encourage a close, ongoing relationship between Joseph and Irma.
The trial court's specific findings regarding this factor are set out in Part III.B.2. supra. Dr. Turner and Ms. Arth testified that Irma had consistently interfered with Daniel's relationship with Joseph and would likely continue to do so in a shared custody arrangement. Both also noted that Irma believed that any relationship between Joseph and Daniel should stem from Joseph's own initiative. Dr. Turner felt that this was especially inappropriate in light of Joseph's young age.
Testimony from other witnesses also established that Irma unduly restricted Daniel's visitation and encouraged Joseph to develop a primary father-child relationship with John. Daniel's mother related that "if [Irma] had her way, [Daniel] would never have [Joseph], and that she only let [Joseph visit Daniel] because she would be in contempt of court if [Joseph] didn't...." Further, the trial court observed that Irma had implemented a "systematic cleansing of [her] home of items that had been built by [Daniel] or owned by [Dell] prior to [her] marriage ... because [she] intended through the establishment of her new relationship with [John] to displace [Daniel] as a father-figure for either child."
By contrast, Dr. Turner and Ms. Arth were convinced that Daniel would encourage a frequent and open relationship between Irma and Joseph. Daniel testified that it was important to maintain a healthy relationship between Irma and Joseph and open communication between himself and Irma. And Daniel's ex-wife testified that Daniel had been fully cooperative in their shared custody of Adam and supportive of Adam's close relationship with both of his parents.
We therefore conclude that the trial court did not err in finding that Irma would not promote an open and continuous relationship between Daniel and Joseph.

C. The Trial Court Abused Its Discretion by Failing to Make Adequate Findings in Support of the Award of Limited Visitation

Irma argues that the trial court abused its discretion by awarding her visitation of only three overnights a month, thus depriving her of the "opportunity to have a meaningful relationship with [Joseph]." Specifically, she faults the trial court for failing to make "integrative findings," because it did not articulate why the limited visitation served Joseph's best interests.
*432 The trial court adopted the recommendations as proposed by Ms. Arth, granting Irma visitation consisting of:
Three weekends of every four from Saturday at 9:00 a.m. to Sunday at 7:00 p.m.; alternate holidays (i.e. [Joseph's] Birthday, Easter Sunday, Thanksgiving Evening, Thanksgiving Day, Christmas Evening, and Christmas Day); [Joseph] spend Mother's Day and Mother's and [Rachel's] Birthdays with Mother; [Joseph] spend Father's Day and Father's and [Adam's] Birthdays with Father; other times as arranged by the parents.
It went on to state:
The court believes that the parties will soon agree to depart from the visitation schedule reflected in paragraph 1. Visitation flexibility was recommended by Dr. Turner but at this time the court cannot, for the reasons stated by Dr. Turner and the child custody investigator recommend joint legal or joint physical custody.
We have held that the trial court must make specific findings supporting a limited award of visitation unless the reasons can be gleaned from the record. See Lone Wolf v. Lone Wolf, 741 P.2d 1187, 1190-91 (Alaska 1987) (remanding for specific findings where court awarded father no visitation during week but mother worked seven days each week); see also Bird v. Starkey, 914 P.2d 1246, 1249 (Alaska 1996) (noting that findings of fact are necessary "so that a reviewing court may clearly understand the grounds on which the lower court reached its decision.") (quoting Waggoner v. Foster, 904 P.2d 1234, 1235 (Alaska 1995)); cf. Monette v. Hoff, 958 P.2d 434, 436 (Alaska 1998) (upholding supervised visitation where trial court "makes findings which specify why unsupervised visitation is contrary to the best interests of the child.") (quoting J.F.E. v. J.A.S., 930 P.2d 409, 409 (Alaska 1996)). We have also recognized that "the cooperation necessary to allow more liberal visitation is far less than that needed for joint custody." Lone Wolf, 741 P.2d at 1191.
In this case, we are unable to discern why the trial court awarded such restricted visitation. We note that the order made no provision for Joseph to spend extended summer or holiday vacations with Irma. We therefore remand this issue to the trial court to make specific findings explaining the award of visitation. The trial court may, in its discretion, conduct a supplemental evidentiary hearing and is authorized to expand the visitation award if appropriate.

IV. CONCLUSION

We AFFIRM the judgment of the trial court granting sole legal and primary physical custody to Daniel. We VACATE the visitation award and REMAND for additional findings.
NOTES
[1] Pseudonyms are used for the parties' names.
[2] The order did not grant Daniel visitation with Rachel. Daniel later withdrew this request because he felt that it had caused Irma to interfere negatively with his relationship with Rachel.
[3] AS 25.24.150(c) provides:

(c) The court shall determine custody in accordance with the best interests of the child under AS 25.20.060  25.20.130. In determining the best interests of the child the court shall consider
(1) the physical, emotional, mental, religious, and social needs of the child;
(2) the capability and desire of each parent to meet these needs;
(3) the child's preference if the child is of sufficient age and capacity to form a preference;
(4) the love and affection existing between the child and each parent;
(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
(6) the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent;
(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;
(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;
(9) other factors that the court considers pertinent.