Marlene M. WEST, Appellant,

v.

Brian S. WEST, Appellee.

No. S–9666.

Supreme Court of Alaska.

April 27, 2001.

18. 723 P.2d at 1292.

Steve W. Cole, Gray, Cole & Razo, P.C., Kodiak, for Appellant.

D. Scott Dattan, Law Office of D. Scott Dattan, Anchorage, for Appellee.

Before FABE, Chief Justice, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

The court presiding over Marlene and Brian West's divorce gave Brian primary custody of the Wests' son Cody; the court based its decision primarily on Brian's anticipated remarriage, which, the court found, would offer Cody the benefit of a "two-parent household." We reverse, holding that custody awards may not be based on the assumption that a divorced parent who remarries can provide a better home than an otherwise equally competent parent who remains single.

## II. FACTS AND PROCEEDINGS

Marlene and Brian separated after seven years of marriage. Upon separation Marlene moved to Oregon with two teenage chil-

dren from a previous marriage, Heather and Gene. At first Marlene and Brian's young son Cody remained with Brian in Kodiak so that Brian could retain his Coast Guard housing. Cody later moved back and forth between his parents' homes every several months. At the time of trial, Cody was enrolled in kindergarten and living in Oregon with Marlene and her sixteen-year-old daughter Heather.

In Oregon Marlene's job required her to leave home early in the morning. Heather was responsible for getting Cody ready and riding the bus with him to school. Marlene was usually back from work by the time Cody returned home in the afternoon. Heather had two years left before graduating from high school; if she moved away from home after her graduation, Marlene planned to leave Cody with his nearby grandparents on school mornings so that they could get him ready for school.

At the time of trial, Brian lived in Coast Guard housing in Kodiak. He was involved in a romantic relationship with Anne Marie Gould, a nurse who lived in Anchorage. Brian and Anne Marie hoped to marry but were reluctant to make definite plans before Brian's divorce became final. Brian expected to remain in Kodiak until July 2001 and then request a transfer to Sacramento. He could not predict his duty locations, other than to say that they would not be outside of the United States.

The evidence at trial included a child custody report describing the family's history and current circumstances and briefly discussing statutorily relevant factors. For the most part, the custody investigator's comments about both parents were equally positive, and she concluded that joint legal custody seemed like a viable option. Under the heading "violence, abuse and neglect," the investigator reported that Marlene expressed "concern [that Brian] may verbally abuse Cody in the future, based on his behavior towards her other children." But the investigator noted that there was no indication that Brian had ever verbally abused Cody and that it "does not seem reasonable to conclude that child abuse is a factor in this case."

The factor that the investigator discussed at greatest length was the amount of time that Cody had lived in a stable, satisfactory environment and the desirability of maintaining continuity. The investigator commented that Cody could flourish in either home and that, if it were not for the physical distance between Marlene and Brian, she would recommend shared physical custody. She observed that there had been little continuity in Cody's life since his parents' separation. The investigator suggested it would be best for Cody to spend the entire school year in one location. Ultimately, the fact that Heather lived with Marlene and that Marlene's extended family lived near her in Oregon formed the basis for the investigator's recommendation that Cody be placed primarily with Marlene and permitted to visit with Brian as much as possible.

At the close of trial the court commented on the investigator's report, which it generally adopted. The court then made oral findings and concluded that it would be in Cody's best interest for Brian to have primary physical custody after the school year ended. The court began with observations about the quality of parenting that both Marlene and Brian could provide to Cody. It observed that both parents had spent extensive time with Cody. The court addressed Marlene's concerns about Brian's parenting and, like the custody investigator, concluded that abuse was not a significant factor. Aside from the discussion of alleged verbal abuse, the trial court's only mention of Cody's siblings was a remark that Heather would graduate in a couple of years.

The court identified differences in the immediate households as important. The court described the situation as follows:

> It's likely that Brian will remarry Anne Marie Gould, and she has long-term stability in the nursing field; about 12 years. And that's a situation that, I think, is very positive because of the number of adults it provides in a household for child-rearing. It's likely that's going to happen. I think highly likely in the near future. And that there would be two adults in that household, part of the immediate family, that would be available most of the time.
>
> . . . .

Brian might be subject to deployments as part of his military duties.... If it happens, it seems to me that Ms. Gould, who likely would be his wife by then, would be in the household to care for Cody.

The trial court later issued written findings of fact and conclusions of law. The court observed that both Marlene and Brian "provide positive environments and living arrangements" and that one was not necessarily better than the other. However, the court observed:

14. Brian West and Anne Marie Gould plan to get married. Her background as a nurse is a positive factor which adds to the advantages for Cody in a two-parent household when he is with Mr. West.

15. The significant difference between the parties is in what is ahead and the kind of household provided for Cody. Brian's household will be the better one for Cody's future.

The written findings did not mention Heather.

The court's conclusions of law stated that it would be in Cody's best interest for primary physical custody to be awarded to Brian once Cody completed the school year. The court went on to establish visitation and child support obligations for Marlene.

## III. DISCUSSION

On appeal Marlene argues that the trial court abused its discretion by using improper factors to determine Cody's best interests. In particular, Marlene argues that it was

improper to award Brian primary physical custody of Cody based on his anticipated remarriage. Marlene also argues that the trial court improperly failed to take into account three factors—Cody's bond with Heather, the disruptiveness of Brian's likely continued relocation, and allegations that Brian had verbally abused Marlene's two older children—which might have supported a determination that it would be in Cody's best interest to live with Marlene. Finally, Marlene asks that we vacate the child support order if we reverse the child custody order.

### A. Standard of Review

 We will reverse a trial court's custody determination if critical factual findings were clearly erroneous or if there has been an abuse of discretion.[1] We will set aside a finding as clearly erroneous if a review of the entire record leaves us firmly convinced that a mistake has been made.[2] It is an abuse of discretion to consider improper factors, to fail to consider relevant statutory factors, or to assign disproportionate weight to some factors while ignoring others.[3] When a custody determination has been made based on improper factors, we remand for a decision based on proper factors.[4]

### B. The Award of Primary Physical Custody on the Basis of Anticipated Remarriage Was Improper.

 Custody determinations must be based on the best interests of the child as determined using the factors listed in AS 25.24.150(c).[5] The trial court must consider

1. See R.I. v. C.C., 9 P.3d 274, 277 (Alaska 2000).

2. See City of Hydaburg v. Hydaburg Co-op. Ass'n, 858 P.2d 1131, 1135 (Alaska 1993).

3. See Borchgrevink v. Borchgrevink, 941 P.2d 132, 134 (Alaska 1997).

4. See Lowdermilk v. Lowdermilk, 825 P.2d 874, 878–79 (Alaska 1992). Cf. Johnson v. Johnson, 564 P.2d 71, 74 (Alaska 1977).

5. The statutory factors are:
(1) the physical, emotional, mental, religious, and social needs of the child;
(2) the capability and desire of each parent to meet these needs;
(3) the child's preference if the child is of sufficient age and capacity to form a preference;
(4) the love and affection existing between the child and each parent;
(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
(6) the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent;
(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;
(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;
(9) other factors that the court considers pertinent.
AS 25.24.150(c).

each of these factors, but it is only required to discuss relevant factors in explaining its decision.[6] Pertinent factors other than the eight specifically listed in the statute can be considered if they are relevant to determining the best interests of the child.[7]

Here, the trial court determined in its written findings that both Brian and Marlene are excellent parents and that only physical distance and Cody's need to attend one school precluded shared physical custody. The court observed that, although Brian and Marlene differed in their parenting styles, both parents had spent equal time with Cody and both had support networks available to them. The court indicated that there had been no child abuse and that complaints about visitation were not significant. The court also found that both Marlene and Brian "provide[d] positive environments and living arrangements" and that there was no evidence that Cody would be better off with Brian than with Marlene.

■ Finding all these factors essentially equal, the trial court proceeded to award primary physical custody of Cody to Brian based on the benefits of "a two-parent household":

> Brian West and Anne Marie Gould plan to get married. Her background as a nurse is a positive factor which adds to the advantages for Cody in a two-parent household when he is with Mr. West.
>
> The significant difference between the parties is in what is ahead and the kind of household provided for Cody. Brian's household will be the better one for Cody's future.

In the court's view, then, Brian's plan to marry Anne Marie, who would provide a "two-parent household," gave him the advantage over Marlene, who would continue to work and had no plans to remarry.

■ Other states have addressed the question of whether a court's ruling on custody in a divorce proceeding may rest on the assumption that a working parent who remarries will be able to provide superior care to the care provided by a single working parent. We agree with the well-reasoned decisions of other courts concluding that the presumed advantages of a two-parent household ordinarily should not determine an award of custody.[8]

■ When awarding custody, the superior court is charged with determining the arrangement that will serve the best interest of the child in the specific case at hand. A child custody determination "cannot be based on an assumption, unsupported by scientific evidence, that a working mother cannot provide such care."[9] Such an assumption unfairly forces divorcing spouses to choose between parenthood and livelihood; and it is likely to disproportionately deprive women of custody, since statistics indicate that divorced men are more likely to remarry a spouse who does not work outside the home.[10]

The trial court expressed concern in its oral findings that, once Heather graduated from school and moved away from home, Marlene would need to drop Cody off at his grandparents' home to get ready for school. The court believed that this routine would be disruptive in comparison to the continuity of care that Cody would receive in the two-

---

**6.** *See Park v. Park*, 986 P.2d 205, 207 (Alaska 1999).

**7.** *See* AS 25.24.150(c)(9); *see also Evans v. Evans*, 869 P.2d 478, 481–82 (Alaska 1994) (affirming custody determination made on basis of nonstatutory factors when parents were equally qualified to care for child in all other respects).

**8.** *See Burchard v. Garay*, 42 Cal.3d 531, 229 Cal.Rptr. 800, 724 P.2d 486, 492 (1986) ("The essence of the court's decision is simply that care by a mother who, because of work and study, must entrust the child to daycare centers and babysitters, is per se inferior to care by a father who also works, but can leave the child with a stepmother at home. . . . [T]his reasoning is not a suitable basis for a custody order."); *Wellman v. Dutch*, 198 A.D.2d 791, 604 N.Y.S.2d 381, 383 (1993) ("[T]he court's award of custody to petitioner principally because his spouse would be home all day to care for the child has the impermissible effect of depriving respondent, an unmarried working mother, of her equal right to custody."); *Brennan v. Brennan*, 165 Vt. 525, 685 A.2d 1104, 1106 (1996).

**9.** *Burchard*, 229 Cal.Rptr. 800, 724 P.2d at 492.

**10.** *See id.* at 492 n. 10; *Linda R. v. Richard E.*, 162 A.D.2d 48, 561 N.Y.S.2d 29, 33 (1990).

parent setting of Brian's home once Brian remarried.

■ But the court's concern rests largely on its unexplained assumption that the added physical convenience of in-home care that Cody might receive from his new second parent—Anne Marie Gould—would outweigh the less tangible, but potentially vital emotional benefits he might receive by maintaining his close and already-established ties to Heather and his maternal grandparents. As other courts have observed, determining which parent can better meet the needs of a child in circumstances like these requires more than "rudimentary hour-counting" or reliance on an assumption that babysitters or extended family are less desirable care givers than stepparents.[11]

■ A presumptive preference for in-home care by a new second parent implicitly treats parenthood as a fungible service, ignores potential stresses associated with step-families, and runs counter to recent scientific evidence.[12] A court may certainly give custodial preference to a two-parent household when case-specific evidence points to the conclusion that the second adult custodian would be advantageous under the particular circumstances actually presented. But in our view, a presumptive preference for the two-parent setting is unwarranted. We thus conclude that, absent case-specific evidence indicating that Anne Marie Gould's in-home care would

be of superior benefit to Cody than the care he would receive from his grandparents and sister, Cody's custody should not have been determined by an expressed preference for the advantages of a "two-parent household."

We turn, then, to the evidence presented at trial. Our review of the trial record reveals no case-specific basis for concluding that Cody's care in Brian's proposed two-parent household would be superior to the care that he would receive in the single-parent setting of his home with Marlene.

The record certainly contains substantial evidence indicating that Brian and Anne Marie could provide excellent care.[13] But comparable evidence—accepted by the trial court—indicated that Cody would also receive excellent care from Marlene, Heather, and his maternal grandparents. What the record lacks, however, is specific evidence establishing which of the two possible home settings—a single-parent or two-parent household—would actually be better for Cody. Nor did the trial court appear to see a need for such evidence. As shown in its written findings, the court simply assumed, all other things being equal, that the "two-parent household" should have the advantage, because it offered Cody more time for in-home care.

As we have already indicated above, this is an unfounded assumption. Child custody orders must be based on the best interests of

11. *Brennan*, 685 A.2d at 1105–06 (reversing a trial court decision awarding custody to father over mother who relied on day care provider); *see Wellman*, 604 N.Y.S.2d at 383 (reversing an order granting custody to father whose wife would care for child over mother who would take the child to be cared for by an aunt in the mornings); *Gerber v. Gerber*, 337 Pa.Super. 580, 487 A.2d 413, 416 (1985) (noting that "a parent's work schedule may not deprive that parent of custody if suitable arrangements are made for the child's care in his or her absence").

12. *See generally* Jennifer E. Horne, Note, *The Brady Bunch and Other Fictions: How Courts Decide Child Custody Disputes Involving Remarried Parents*, 45 Stan. L.Rev.2073 (1993) (discussing research indicating that children do not accept stepparents as replacement parents and data about the instability of stepfamilies).

13. We note, however, that the record in this case is equivocal in its support of the trial court's findings that Brian would marry Anne Marie and

that they would successfully arrange their work schedules to ensure that one of them would usually be at home to care for Cody. Anne Marie—who by her own estimate had seen Cody on only a dozen occasions—described her relationship with him as "decent": "I think we have a—decent relationship. I don't—I don't inundate Cody. I let him come to me." With respect to marriage, Brian testified that he and Anne Marie would probably get married and start a family of their own. Anne Marie testified that she hoped to marry Brian but that they had not made definite plans. Her testimony concerning her future work schedule was even more tentative. She did say that she hoped to be able to reduce her work hours and to mesh her schedule with Brian's, so that she could "possibly [work] on weekends when Brian would be home." But she said this in describing her hope to "start a family," not in describing her willingness to provide home care for Cody.

the particular child. Here, we find no sound, case-specific evidentiary basis for concluding that the qualitative benefits of extended-family care that would have been available to Cody with Marlene should be deemed less desirable than the improved physical convenience of the in-home stepparenting that he might experience with Brian. Accordingly, we conclude that it was improper to award primary physical custody of Cody to Brian on the basis of Brian's anticipated marriage to Anne Marie.

### C. Other Issues

 Marlene separately argues that the trial court abused its discretion by failing to award custody to her based on sibling bonds, the disruptiveness of Brian's likely future relocations, and allegations that Brian abused the older children. But given our decision to remand this case for a redetermination of custody, we need not consider these issues here.[14] Marlene will have the opportunity to present these arguments to the trial court on remand.[15] We assume that the court will carefully reconsider them, among all other factors relevant to its determination of Cody's current best interests.

### IV. CONCLUSION

Because it was error to award primary physical custody of Cody to Brian on the basis of his anticipated marriage to Anne Marie, we VACATE the trial court's custody order and REMAND for a redetermination of custody based on Cody's current best interests.

MATTHEWS, Justice, not participating.

---

**14.** Our decision to remand also moots Marlene's challenge to the superior court's child support order.

**15.** To avoid potentially unnecessary relitigation of a contentious issue, however, we note our conclusion that the superior court was not clearly erroneous in declining to attach significant weight to evidence of verbal abuse by Brian.