## ADOPTION OF L.E.K.M., A Minor Child Under the Age of 18 Years.

### No. S–10199.

Supreme Court of Alaska.

May 30, 2003.

---

William Grant Callow, Law Offices of W. Grant Callow, Anchorage, for Appellants.

Vanessa H. White and Lynda A. Limon, Anchorage, for Appellees.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

### I. INTRODUCTION

Mona and Jules M.[1] and Emma and Rod M. appeal the superior court's dismissal of their adoption petitions and the award of primary legal and physical custody of their granddaughter and niece to Elsa and Dillon C., family friends. They ask us to apply the relative-placement preference found in AS 47.14.100(e) to the adoption proceedings and argue that the superior court made erroneous factual and legal findings. Because AS 47.14.100(e) has previously been held not to apply to adoption proceedings, and because we find no clear error or abuse of discretion, we affirm the decision of the superior court.

### II. FACTS AND PROCEEDINGS

This case is a contested adoption proceeding in which three different married couples are seeking to adopt Lucy M., an orphan. The first couple are Lucy's paternal grandparents, appellants Jules and Mona M. The second couple are Lucy's paternal aunt and uncle, appellants Emma and Rod M. The third couple, who have had custody of Lucy since she was orphaned, are appellees Elsa and Dillon C., Lucy's mother's best friends and Lucy's day care providers when her parents were alive. All the parties live in Anchorage.

The case arises out of a tragic murder-suicide on July 24, 1999 in Anchorage. Cole M. shot and killed his girlfriend, Sally D.,

---

1. Pseudonyms have been used throughout this opinion for the parties.

and then himself. Sally's body fell on and smothered their three-and-a-half-month-old daughter Dolly M. Only Dolly's identical twin sister Lucy survived. Anchorage police placed Lucy with Elsa C. at the advice of Sally's stepfather. The police also filed a Report of Harm with the Division of Family and Youth Services (DFYS) on July 26, 1999. DFYS decided to take legal custody of Lucy, but left her in the home of the C.s, probably because Elsa C. had been Lucy's full-time day care provider during the previous month and because Sally D. had left the twins with Elsa on several overnights, whereas the M.s had not had similar contacts with Lucy on a daily or overnight basis. Lucy was adjudicated a child in need of aid (CINA) on August 23, 1999.

After intervening in the CINA case, the C.s filed a petition for adoption in November 1999. The elder M.s cross-petitioned for adoption in January 2000 and filed a Motion for Order Vacating the CINA Adjudication and Directing that the Child be Placed with her Relatives. The younger M.s filed a cross-petition for adoption in February 2000.

A hearing was held on February 3, 2000 to determine the course of the case, and at that time the parties agreed that because there were three families eager to adopt Lucy, the involvement of DFYS in her case was not necessary. The CINA case was therefore closed. An interim custody order provided that Lucy spend five days per week with the C.s and two days with all of the M.s, which was a continuation of the visitation schedule that had been designed cooperatively by the parties shortly after the deaths of Lucy's parents.

Superior Court Judge John E. Reese heard the adoption trial over seven days in April 2001. At the close of trial, Judge

Reese found that all parties would have made fine parents, making the final decision "as hard as anything I've ever had to deal with here." In its findings of fact and conclusions of law, the superior court found that the C.s were Lucy's "home base" but that Lucy also had a vital relationship with the M.s and must not be prevented from seeing them. Accordingly, the court found, pursuant to AS 25.23.120(d),[2] that it was in Lucy's best interest to dismiss the adoption petitions and enter an order granting primary legal and physical custody to the C.s and weekly visitation to the M.s as a group. This appeal of the adoption case followed.

## III. STANDARD OF REVIEW

 An adoptive placement determination should be reversed only when "the record as a whole reveals an abuse of discretion or if controlling factual findings are clearly erroneous."[3] The trial court abuses its discretion if it considers improper factors, fails to consider relevant statutory factors, or assigns disproportionate weight to some factors while ignoring others.[4] In an adoption case, the court's factual findings are reviewed under the "clearly erroneous" standard.[5] A finding is clearly erroneous when "a review of the entire record leaves us firmly convinced that a mistake has been made."[6]

 We do not review issues not raised at trial except for plain error, that is, " 'where an obvious mistake has been made which creates a high likelihood that injustice has resulted.' "[7]

We apply our independent judgment to questions of law and "adopt the rule of law most persuasive in light of precedent, reason,

---

**2.** AS 25.23.120(d) provides: "If the requirements for a decree under (c) of this section have not been met, the court shall dismiss the petition and determine, in the best interests of the minor, the person including the petitioner to have custody of the minor." AS 25.23.120(c) states that the judge may grant the petition for adoption if all necessary parties consent and if it is in the best interest of the child.

**3.** *L.G. v. State, Dep't of Health & Soc. Servs.,* 14 P.3d 946, 950 (Alaska 2000).

**4.** *West v. West,* 21 P.3d 838, 841 (Alaska 2001).

**5.** *In re J.J.J.,* 718 P.2d 948, 957 (Alaska 1986).

**6.** *West,* 21 P.3d at 841.

**7.** *D.J. v. P.C.,* 36 P.3d 663, 667–68 (Alaska 2001) (quoting *Sosa v. State,* 4 P.3d 951, 953 (Alaska 2000)).

and policy."[8]

## IV. DISCUSSION

### A. Alaska Statute 47.14.100(e)(1) Cannot Be Imported into AS 25.23.120.

 The M.s contend that we should develop Alaska law by holding that AS 47.14.100(e)(1),[9] which generally prohibits the foster placement of a child who has relatives (by blood or marriage) who are willing to care for the child, must be applied to AS 25.23, which governs adoption procedures. On this basis, they request that we reverse the trial court's determination and instead grant adoption of Lucy to them.[10] This argument is frequently made in adoption proceedings regarding children in need of aid, and we have repeatedly found that "there is no ... blood-relative preference in *adoption* cases."[11] Alaska Statute 47.14.100(e) is limited by AS 47.14.100(f), which states in part, "[n]othing in this subsection or in (e) of this section applies to child placement for adop-

tive purposes." Subsection 100(e) allows blood relatives to petition for initial placement of a child in need of aid, and in *W.E.G.* we held that grandparents wishing to exercise this preference should petition DFYS for custody or ask for *de novo* review of DFYS's decision if their request is denied.[12] Subsection 100(e) binds only DFYS; we have held that the interests of the child in need of aid require the application of different statutory standards from those in other family law situations.[13] Just as children in need of aid may have relationships with foster parents that may need to be protected by the state in adoption proceedings, we have also held that a non-relative with a significant relationship to a child may have equal standing with the child's own parent to request custody of the child before the court.[14] In a private adoption case, such as this one became after the CINA case was dismissed, there are many reasons why the court may perceive adoption by a non-relative to be in the best interest of the child,[15] and we see no basis on which to

8. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

9. AS 47.14.100(e)(1) provides:
 A child may not be placed in a foster home or in the care of an agency or institution providing care for children if a relative by blood or marriage requests placement of the child in the relative's home. However, the department may retain custody of the child and provide for its placement in the same manner as for other children if the department
 (1) makes a determination, supported by clear and convincing evidence, that placement of the child with the relative will result in physical or mental injury....

10. The M.s did not make this argument at trial, apparently recognizing that Title 47 of the Alaska Statutes, dealing in relevant part with children in need of aid, is very different from Title 25, dealing in relevant part with adoption. This court does not review issues not raised at trial except for plain error. *D.J.,* 36 P.3d at 667–68 (explaining that plain error exists " 'where an obvious mistake has been made which creates a high likelihood that injustice has resulted' " (quoting *Sosa,* 4 P.3d at 953)). The failure of the trial court to import an unrelated statute into the adoption proceedings cannot be plain error.

11. *In re W.E.G.,* 710 P.2d 410, 413 (Alaska 1985) (specifically declining to give grandparents of children in need of aid preference over foster parents for adoptive purposes, instead remanding to trial court to consider best interest of

child). *See also P.M. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 42 P.3d 1127, 1136–37 (Alaska 2002); *S.S.M. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 3 P.3d 342, 345–46 (Alaska 2000).

12. 710 P.2d at 413. The M.s also argue that AS 47.14.100(f) should not be applied to Lucy's case because they claim her placement by DFYS was not a properly adoptive one. However, *W.E.G.* makes clear that any errors made by DFYS are properly appealed from the CINA case, not this adoption case: "the grandparents did not request *de novo* review of the Division's original inaction on their request to become the boys' foster parents. That issue is therefore not before us." *Id.* The M.s stipulated to the dismissal of the CINA case; any appeal of DFYS's decision should have occurred at that time.

13. *See In re Adoption of B.S.L.,* 779 P.2d 1222, 1226–27 (Alaska 1989) (observing that adoption and child-in-need-of-aid proceedings serve different purposes justifying use of different statutory standards for termination of parental rights).

14. *Buness v. Gillen,* 781 P.2d 985, 988 (Alaska 1989).

15. *See, e.g., W.E.G.,* 710 P.2d at 412–13 (explaining that parent of child in need of aid consented to foster parents' petition for adoption, but refused consent to, and contested, grandparents' petition for adoption).

interfere with the statutory scheme as it exists.

▮ The M.s also contend that because it was never shown clearly and convincingly that placement of Lucy with them, her blood relatives, would result in physical or mental injury to her under AS 47.14.100(e), the superior court erred in awarding custody to the C.s, who are not relatives. However, as explained above, AS 47.14.100(e) does not apply to this case, and therefore the "clear and convincing" showing of "physical or mental injury" is not applicable. In an adoption case, the relevant factors are the consent of the parents and the best interests of the child.[16]

▮ Finally, the M.s argue that the failure to enter an adoption order in the case has resulted in a foster care situation, that the C.s are not licensed foster parents, and that they do not meet any of the exceptions established in AS 47.35.015(b) for unlicensed day care providers. Foster care arrangements are created by DFYS pursuant to AS 47.14.100, not by judges in adoption cases pursuant to AS 25.23.120(d). The superior court's order did not violate any foster care statute.

### B. The Superior Court Did Not Clearly Err in Its Factual Findings.

The M.s challenge two of the superior court's factual findings as clearly erroneous. Because a review of the entire record does not leave us firmly convinced that a mistake has been made in either instance, we reject the challenge.

#### 1. Dillon C.'s teenage mental health

▮ The M.s argue that the superior court was clearly erroneous in its finding that aspects of Dillon C.'s mental health history, which involved in- and out-patient treatment for post-traumatic stress disorder in 1990, were "treated and no longer an issue" at the time of trial. The M.s argue that, based on later incidents in which Dillon C. shouted at

co-workers (incidents for which he was dismissed from his job but later re-hired by the same employer), it was error for the court to find that Dillon C.'s mental health poses no obstacle to the custody order that the court entered. The superior court's finding was supported by the testimony of a psychologist, Dr. Harper, who evaluated Dillon C. and testified that Dillon did not suffer from a personality disorder or any other condition affecting his ability to be a parent. The finding was not clearly erroneous.

The M.s attack Dr. Harper's involvement with the case on several grounds: that he gave Dillon C. the MCMI–III personality test instead of the MMPI–II test, that he read only a small part of Dillon's 500–page file from his treatment at Charter North, that he did not disclose that he was briefly involved with Dillon's treatment there, and that he was added to the witness list late. However, there was evidence that tended to show that the MCMI–III test was the more appropriate test because of Dillon's prior medical history and that Dr. Harper read the most important parts of a file that spanned five months of ongoing treatment and would have included any reports on art therapy and blood medication level checks. Moreover, the superior court denied the M.s' motion to preclude Dr. Harper from testifying at trial, finding that all parties had submitted their witness lists late, that they had known of Dr. Harper's involvement in the case for months, that the failure to disclose Dr. Harper's involvement in Dillon's 1990 treatment revealed no ethical breach but rather a memory lapse, and that the M.s' objections went to the weight of his testimony rather than its admissibility. We find no error in the superior court's treatment of the issues surrounding Dr. Harper's testimony.

#### 2. Adequate income

▮ The M.s allege that the court's finding that the C.s were financially able to care for Lucy was clearly erroneous. They contend (1) that the custody investigator did not

---

**16.** AS 25.23.120(c). The superior court in this case informed the parties, and the parties apparently had no objection, that it intended to adjudicate the best interests of the child according to the child custody factors listed in AS 25.24.150(c), which do not include a blood relative placement.

fully analyze the C.s' financial status, (2) that the C.s generally had low balances in their checking account, and (3) that their adoption home study was not current and it thereby failed to provide adequate financial information. We reject their claim of error.

First, while the custody investigator merely stated her conclusion that all the competing families could meet Lucy's material needs, the author of the adoption home study devoted sufficient attention to the financial issues. She reported that both Elsa and Dillon were employed, found that they provided a clean and comfortable home on their present resources, and noted that they had been referred to the local WIC (Women, Infants, and Children) program that provided assistance in meeting children's nutritional needs. The adoption home study similarly concluded that the C.s provided a suitable home. The court had adequate information on this issue.

Second, that the balances in the C.s' bank accounts at any one time were low is not indicative of their ability to provide for Lucy. What is important is that they did provide for the child's needs. Based on the evidence before it, the superior court did not clearly err in finding that they did provide for the child's needs. The law requires no more than that the proposed parents be able to meet the child's basic needs.[17] At the time of trial, Elsa C. had a home day care business, and Dillon C. made about $18.50 per hour at his full-time job.

Finally, the M.s misinterpret the relevant law regarding home studies. Alaska Statute 25.23.100(e), which the M.s rely upon in arguing that the home study was not current, requires only that a home study be performed within thirty days of the selection of the person who will perform the study, not within thirty days of the final adoption hearing. The M.s have made no showing that this requirement was not met.[18]

The M.s have not shown that the superior court clearly erred with regard to any finding that concerned the adequacy of the C.s' income.

## C. The Superior Court Did Not Abuse Its Discretion in Making the Custody Determination.

The M.s argue that the superior court abused its discretion in several respects. We consider each argument in turn.

### 1. The importance of a child's "kinship circle"

The M.s argue that in not granting their adoption petition, Judge Reese did not place enough importance upon the evidence presented by their experts that adopted children fare best among their "kinship circle," where they may develop a stronger sense of family history, genetics, and identity formation.

The superior court took the kinship circle argument seriously, and cited its importance in the opinion. However, the superior court also found that "[Sally D.] is as important to [Lucy] as [Cole M.]." The evidence tended to show that the M.s knew little about Lucy's mother and maternal family, whereas Elsa C. had grown up with Sally D. as children, still kept in contact with her family, and had been close to Lucy's parents when they were alive. The superior court heeded the family circle argument, but recognized that Lucy had two family circles. By necessity, her kinship relationship with one of those families will have to be met through visitation rather than primary custody. We do not find an abuse of discretion on this point.

### 2. Primary caregiver preference

The M.s contend that Judge Reese gave custody to the C.s "simply because they have been her primary caregivers since the death of her parents and [she] might experience some emotional trauma if transitioned into the care of the [M.] Family." They point out that although "the length of time the child has lived in a stable,

17. AS 25.24.150(c)(1) and (2).

18. To the extent that the M.s' argument may be construed as a claim that a second home study should have been prepared, 7 Alaska Administrative Code 56.660(j) requires a second home study only if the child has not actually begun living with the petitioners within a year of their first home study.

satisfactory environment and the desirability of maintaining continuity"[19] is one of the statutory best-interest factors in determining child custody, nonetheless we have held that the trial court cannot simply assume that the current primary caregiver is automatically the best caregiver for the child.[20] However, the issue was not merely primary caregiving, but whether removing Lucy from the primary custody of the people with whom she had spent twenty-one of her twenty-four months would be unnecessarily traumatic for her, especially since she had already lost one set of parents. The record shows that the superior court carefully questioned in *voir dire* each expert who testified on child psychology about the possible effects on Lucy of being separated from the C.s, and overruled objections to such questions when asked.[21] There was evidence in the record to support a conclusion that the transfer of custody could be risky, and such trauma is properly considered during a custody determination under AS 25.24.150(c)(5).[22] We find no abuse of discretion on this point.

19. AS 25.24.150(c)(5).

20. *I.J.D. v. D.R.D.*, 961 P.2d 425, 430 (Alaska 1998) (citing *Evans v. Evans*, 869 P.2d 478, 483 n. 4 (Alaska 1994)).

21. One expert, Dr. Carey Edney, testified solely on the issue of whether children under three years of age are likely to suffer from "reactive attachment disorder" when placed in too many primary caregiver situations. The M.s urge that her testimony be stricken because she did not meet with any of the parties or read any materials that were specific to Lucy, and rely on *C.J. v. State, Department of Health & Social Services*, 18 P.3d 1214, 1218 (Alaska 2001). We find *C.J.* inapposite because different legal and factual standards were involved. The problem in *C.J.* was that in order to terminate the parent's rights, the state was required by the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1912(f) (West 2002), to present testimony by a qualified expert that return of the children in that case to their parent would likely result in serious damage to those children; the sole expert in that case had never assessed the children or parent personally, but had only read the DFYS reports about the children. *C.J.*, 18 P.3d at 1218.

In contrast, this is an adoption contest being adjudicated under child custody principles, and the parties are free to prove "the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity" in any way they see fit, which need not necessarily include experts. There were several

### 3. Overreliance on custody investigator's report

 The M.s contend that it was an abuse of discretion for Judge Reese to rely on and "effectively adopt[ ]" the custody investigator's recommendation on custody. The M.s allege that the report of Pamela Montgomery, A.C.S.W., the custody investigator, was "improperly biased and fundamentally unreliable" because she was not qualified to assess whether Lucy would be harmed by a gradual removal from the custody of the C.s. However, Montgomery was properly qualified under Alaska Rule of Civil Procedure 90.6 governing child custody investigators, and two of the three expert witnesses testified that removal from primary parental bonds puts children at risk for developmental and attachment difficulties. There is no evidence showing that the superior court relied on Ms. Montgomery alone in making its determination on this point.[23]

 The M.s also allege that Montgomery was biased against them because the C.s'

witnesses in this case who testified from personal experience to Lucy's attachment to the C.s, including the custody investigator, and Dr. Edney claimed only to testify as an expert regarding child psychology principles in general. Expert witnesses are entitled to testify from facts made known to them at the hearing. Alaska Rule of Evidence 703. *See also J.A. v. State, DFYS*, 50 P.3d 395, 400 (Alaska 2002) (emphasizing that even in ICWA case, lack of pretrial interview not determinative of whether experts' testimony sufficient to support finding of harm).

22. Moreover, in *W.E.G.* we ruled that the length and quality of time that foster children had spent with their foster parents were relevant in determining whether the foster parents or the biological grandparents should ultimately be allowed to adopt. *In re W.E.G.*, 710 P.2d 410, 417 (Alaska 1985).

23. The superior court might well have benefitted from the appointment of a guardian *ad litem* for Lucy. Because the CINA case was dismissed, the state was not present to represent the child's best interests. Because no guardianship proceeding was filed under AS 13.26, a guardian was not available. Although the Alaska Statutes do not appear to address the issue directly, we doubt that the legislature envisioned allowing an adoption battle between three sets of competing, would-be adoptive parents to be visited upon an orphaned infant with no neutral legal custodian to speak for her and protect her best interests. Because the parties elected (and the state evi-

former lawyer mailed Montgomery a copy of the *W.E.G.* case.[24] They suggest that Montgomery, after reading *W.E.G.*, became overly concerned that the C.s would have no standing to ask for visitation if the M.s' adoption petition were granted, and that Montgomery's participation in this *ex parte* communication was unethical. However, Montgomery's written report states that her primary concern in recommending that Lucy be placed with the C.s was that she did not want Lucy to suffer yet another loss of attachment with a primary caregiver. Moreover, Alaska Rules of Civil Procedure 90.6(d)(3)[25] and 90.6(g)(1)[26] suggest that *ex parte* communication between the custody investigator, the parties, and their attorneys is not *per se* unethical. Civil Rule 90.6(b)(1)(E)[27] also requires a qualified custody investigator to have knowledge of relevant Alaska statutes and rules relating to custody determinations. We find no abuse of discretion here.

██ The M.s also contend that Montgomery's report was inaccurate and suffered from deficiencies on several points, including whether Lucy shared a bedroom in the C.s' home. The allege that the report failed to include Dillon C.'s full criminal history, failed to contain interviews with prior domestic partners, and contained errors made by a private investigator about the M.s. None of this information was dispositive for Montgomery or any of the experts who testified, and there is no support in the record for the proposition that the superior court abused its discretion in considering Montgomery's report. The record shows that the court

shared the custody investigator's concern that a third family placement for a two-year-old could be damaging to her emotional health, and consulted all the experts available to him at trial while deciding not to take that risk. We find no abuse of discretion on this point.

### 4. Dillon C.'s relationships with his other children

██ The M.s contend that because Dillon C. has ceased to have meaningful contact with one of his three biological children, it was an abuse of discretion for the superior court to grant Elsa and Dillon C. custody of Lucy. Dillon C.'s relationship with Lucy is the one that is relevant for the purpose of determining her adoption and custody, and evidence supported the contention that their relationship was active and appropriate. We find no abuse of discretion.

### 5. Health insurance

██ The M.s claim that it was an abuse of discretion for the superior court to grant the C.s custody instead of adoption, claiming that only if Lucy had been adopted would she have been eligible for coverage by the C.s' health insurance under AS 21.36.095. However, the M.s introduce no evidence that Lucy has in fact been denied health insurance coverage under any policy held by the C.s. Although 7 Alaska Administrative Code (AAC) 56.660(b)(15)[28] does state that insurance is a factor to be considered in an adop-

---

dently consented) to dismiss the CINA proceeding, because current Alaska law does not appear to require appointment of a guardian in this situation, and because the parties did not request appointment of a guardian or guardian *ad litem* below or raise the issue on appeal, we conclude that the superior court did not abuse its discretion in its ruling on the case as it was presented. Our affirmance should not be taken as approving a model for future similar cases.

**24.** *W.E.G.*, 710 P.2d at 417.

**25.** Alaska R. Civ. P. 90.6(d)(3) provides: "The custody investigator may meet with the parties jointly or separately at any time to discuss the investigation and the investigator's conclusions in order to facilitate a voluntary resolution of the issues."

**26.** Alaska R. Civ. P. 90.6(g)(1) provides: "Unless otherwise ordered, a custody investigator may communicate with a party who is represented by an attorney without prior notice to the attorney."

**27.** Alaska R. Civ. P. 90.6(b)(1)(E) states in relevant part: "Specifically, the custody investigator should have an understanding of the following as appropriate to the case:.... Alaska statutes and rules relating to custody determinations."

**28.** 7 AAC 56.660(b) provides: "The agency shall obtain all available information about each adoptive applicant regarding the following: ... (15) financial status and ability to support a child, including income, financial resources, debts, expenses, employment history, insurance coverage, and the family's ability to address possible ongoing needs of the child."

tion home study, there is nothing to indicate that health insurance should be the overriding factor in the best-interests determination for the judge. We find no abuse of discretion on this score.

## V. CONCLUSION

Because the superior court's factual findings were not shown to be clearly erroneous, because the superior court did not abuse its discretion in its placement decision, and because the superior court correctly applied the applicable law, we AFFIRM the decision of the superior court in all respects.