MARTIN N., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, DIVISION OF FAMILY & YOUTH SERVICES, Appellee.

No. S–10754.

Supreme Court of Alaska.

Sept. 12, 2003.

Rehearing Denied Nov. 28, 2003.

Scott A. Sterling, Sterling & DeArmond, P.C., Wasilla, for Appellant.

Gregg D. Renkes, Attorney General, Juneau, and Toby N. Steinberger, Assistant Attorney General, Anchorage, for Appellee.

Erica Kracker, Kracker Law Office, Palmer, Guardian ad Litem.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A father appeals the decision of the superior court terminating his parental rights under AS 47.10.088 and denying his request to stay termination proceedings until the Alaska Division of Family and Youth Services investigates possible placement of his infant daughter with his parents or sister under AS 47.14.100(e). Because the court properly terminated the father's rights under AS 47.10.088, and because the placement issues were irrelevant to the termination proceeding, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

Hannah G.[1] and Martin N. met in June 1999, immediately began living together in Talkeetna, and eventually discussed marriage. Their relationship was marked by violence and controlling behaviors in which Martin, among other acts, used a gun to shoot Hannah's dishes; prevented her from leaving an argument by grabbing her at the neck, holding her up against the wall while kneeing her in the stomach, and finally pointing a gun at her, at which time she was three months pregnant; shouting at her in a bar and commanding her to get in his truck; and threatening to kill her cat and dog. Hannah testified that on many of these occasions Martin had been using alcohol. On December 12, 1999, while Hannah was four months pregnant, Martin threatened to kill her and then shot her once in her right buttock. Martin was arrested and jailed in Palmer in connection with the shooting on December 13. Hannah visited Martin in jail frequently; she later claimed that she had done so because he threatened harm to her.

On October 22, 2001 a jury convicted Martin of first-degree assault and third-degree weapons misconduct, and he was sentenced to fifteen- and three-year consecutive terms, respectively, which was the presumptive sentence based on his prior felonies. He will

---

**1.** Pseudonyms have been used throughout this opinion to protect the identity of the parties.

be eligible for parole in 2013. Martin's conviction is currently on appeal and he has maintained his innocence throughout these proceedings, but he recognizes that he is estopped from contesting the facts underlying his conviction.[2]

On May 4, 2000 Hannah gave birth to Martin's daughter Amanda N. Amanda is the third of Hannah's four children. The custody of one older half-brother is shared between Hannah and that child's biological father; another older half-brother lives with Hannah's mother; and Amanda's younger half-brother lives with Hannah and her new husband. For several months after Amanda's birth, Hannah brought Amanda to visit Martin in jail nearly every day. Since Amanda's birth Hannah had been receiving help from the Division of Family and Youth Services (DFYS) but was unable to maintain consistent housing. In October 2000 DFYS took custody of Amanda because Hannah and the baby were living in a car, Hannah was not taking medication for bipolar disorder and was acting irrationally, Amanda was inadequately clothed and fed, and Amanda had a high fever. In November 2000 both parents stipulated that Amanda was a child in need of aid on the grounds of abandonment and neglect. Amanda was placed with a foster family with whom she has lived ever since.

Upon hearing that Amanda had been taken into custody in October 2000, Martin immediately contacted his sister and stepmother in Spokane, Washington; the parties dispute whether his sister contacted DFYS asking that Amanda be placed with her at that time. Initially all parties agreed that it was best for DFYS to work toward reunification of Amanda and Hannah, and that this would be best achieved by leaving Amanda in her foster placement where she would have frequent access to her mother, visitation with her father, and access to her half-siblings, none of which would have been possible had she been placed with her father's relatives in Washington or her maternal grandmother in the Trapper Creek/Talkeetna area.

Martin had five visits with Amanda while he was in jail at the Mat–Su Pretrial Facility. While the first visit was successful, on the second visit in December 2000 Amanda became agitated, began "to cry a loud angry cry," and refused to stop for several days, resulting in vomiting, diarrhea, and sleep disturbances. When this also occurred on subsequent visits, Amanda was referred to a doctor, who determined that the visits should cease. There was no evidence that Martin had done anything to provoke this reaction, and in fact Amanda's foster parents find that they cannot leave her in day care because she similarly "scream[s] bloody murder" when they try.

DFYS's initial case plans for Martin, developed in November 2000 and April 2001, relied on his insistence that his incarceration was temporary, and consisted of parenting classes, psychological evaluation, drug monitoring, and supervised visits. He initially took several parenting classes while in jail, but later was put in maximum security because of his in-jail behavior, and as a result was unable to participate in further classes because of restrictions on his movement. At trial, Martin's probation officer testified that Martin had been put into maximum security status as a result of a high "frequency and volume" of disciplinary problems. The social worker assigned to Amanda's case also testified that Martin threatened him with bodily harm. Because Martin was in maximum security, he was unable to comply with the final case plan drawn up in September 2001, which called for, among other things, his attendance at further substance abuse and anger management classes.

DFYS eventually became concerned about the length of time that Amanda had been in foster care. Because of that and because she was becoming closely bonded with her foster parents, DFYS petitioned to terminate Hannah's and Martin's parental rights in October 2001. Martin was found guilty of assault and weapons misconduct and was sentenced on October 22. A permanent placement hearing was held on November 9, 2001 before Superi-

**2.** *Lyman v. State,* 824 P.2d 703, 705 (Alaska 1992); *Rapoport v. Tesoro Alaska Petroleum Co.,* 794 P.2d 949, 952 (Alaska 1990).

or Court Judge Eric Smith, who held that the child's foster placement should not be disturbed and converted it into a potentially permanent living arrangement.

## B. Proceedings

Hearings on the petition to terminate were held over five days in March and April of 2002. At trial, the state did not pursue termination of Hannah's parental rights, because her condition had improved significantly after she began taking proper medication and established a stable household. Hannah's position at trial was that if Martin's rights were terminated, then she would relinquish hers, because she felt that it was in the best interests of her child to be placed permanently with her foster parents. The superior court terminated Martin's parental rights under AS 47.10.080(*o*) and AS 47.10.088, holding that Amanda remained a child in need of aid under AS 47.40.011 subsections (2), (6), and (8). Martin appeals.

## III. STANDARD OF REVIEW

We will reverse the factual findings of the superior court in a termination of parental rights case only when those findings are clearly erroneous, a standard which is met only if we are left with a definite and firm conviction that a mistake has been made after review of the entire record.[3] When reviewing factual findings, "we view the evidence in the light most favorable to the party prevailing below";[4] we ordinarily will not overturn a trial court's finding based on conflicting evidence.[5] The issue of whether the trial court's findings are consistent with the child in need of aid statutes is a question of law that we review *de novo*,[6] adopting "the rule of law that is most persuasive in light of

precedent, reason, and policy."[7] "We bear in mind at all times that terminating parental rights is 'a drastic measure.' "[8]

## IV. DISCUSSION

Martin argues that the superior court erred in terminating his parental rights. He also argues that the superior court erred by refusing to stay the termination proceedings and refusing to order DFYS to investigate his parents and sister as possible permanent placements for Amanda under AS 47.14.100(e). Because Judge Smith's factual findings were not clearly erroneous, and because his legal rulings and application of the law to the facts were proper, we affirm.

### A. Martin's Parental Rights Were Properly Terminated Under AS 47.10.088.

When the state petitions to terminate the rights of a parent under AS 47.10.088, the superior court must make several findings before termination may occur. First, it must find by clear and convincing evidence that the child has been subjected to conduct or conditions making the child a child in need of aid under AS 47.10.011.[9] Second, it must find by clear and convincing evidence that the parent has not remedied the conditions or conduct placing the child at risk, or has failed to make sufficient progress in a reasonable period of time such that the child remains at substantial risk of physical or mental injury.[10] Third, it must find by a preponderance of the evidence that DFYS made reasonable efforts to help the parent remedy the problematic behavior or conditions.[11] Finally, it must find by a preponderance of the evidence that termination of pa-

3. *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1203 (Alaska 2002).

4. *In re J.L.F. & K.W.F.*, 828 P.2d 166, 170 n. 12 (Alaska 1992), *superseded on other grounds by statute*, ch. 99, § 1, SLA 1998.

5. *In re Friedman*, 23 P.3d 620, 625 (Alaska 2001) ("We ordinarily will not disturb findings of fact made upon conflicting evidence.").

6. *V.S.B.*, 45 P.3d at 1203.

7. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

8. *R.J.M. v. State*, 946 P.2d 855, 861 (Alaska 1997) (quoting *J.L.F.*, 828 P.2d at 170), *both of these cases superseded on other grounds by statute*, ch. 99, § 1, SLA 1998.

9. AS 47.10.088(a)(1)(A).

10. AS 47.10.088(a)(1)(B).

11. AS 47.10.088(a)(2) (citing AS 47.10.086).

rental rights is in the best interests of the child.[12] Martin challenges the superior court's findings on each of these issues.[13]

### 1. Alaska Statute 47.10.088(a)(1)(A): Amanda was a child in need of aid on the bases of substantial risk of future physical harm and future mental harm.

The superior court found that Amanda had been subjected to conditions causing her to be a child in need of aid under AS 47.10.011. Martin contests the superior court's findings.[14]

#### a. AS 47.10.011(6): substantial risk of physical harm

The trial court found that Amanda was a child in need of aid under AS 47.10.011(6), which provides in part that a child may be found to be in need of aid if "the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent." Martin first argues that the trial court's holding was erroneous because he has never caused physical harm to Amanda in the past. But the trial court's ruling was specifically directed to the likelihood of future harm under AS 47.10.011(6); the state is not required to wait to intervene until a child has suffered actual harm.[15] Martin responds that the finding that he

poses a risk of future harm is erroneous because his violent tendencies are not a "condition" created by him. We disagree. We analyze "the totality of the State's evidence" in assessing the risk of future physical harm to a child.[16] Looking at all of the evidence, it is clear that Martin has violent tendencies that pose a risk of future harm to Amanda. Martin kneed Hannah in the abdomen and shot her in the buttock while she was pregnant, and repeatedly threatened Hannah, her possessions, and her pets with guns. While in jail, he continued his threatening and controlling behavior toward Hannah, and also threatened the social worker. Martin himself admitted that he entered into confrontations with other prisoners while in jail, and that his attitude and disciplinary history in jail was poor, but he argues that he never directed violence at Amanda. We considered a similar argument in In re J.A.,[17] where a parent argued that the previous violence between the parents had never placed the child in danger. We rejected that argument, noting that

[t]he violent behavior of [the parents] need not have been directed at [the child] to place him in physical danger. As another court has acknowledged, "[m]any violent acts could be committed in the child's presence, but not directed toward the child, in such a manner as to actually endanger the child's physical well-being." [18]

cause we affirm the trial court's holding that Amanda was a child in need of aid on the bases of AS 47.10.011(6) and (8), it is not necessary to reach the third issue of whether she was also a child in need of aid on the basis of AS 47.10.011(2).

**12.** Alaska Child in Need of Aid Rule 18(c)(2)(C); see also AS 47.10.088(c).

**13.** Martin additionally challenges the trial court's termination of his parental rights on the basis of AS 47.10.080(o). Because we affirm the trial court's holding terminating parental rights under AS 47.10.088, it is not necessary to reach the issue of whether Martin's parental rights were also properly terminated under AS 47.10.080(o).

**14.** The trial court found that Amanda was a child in need of aid on three grounds: AS 47.10.011(2) (one parent incarcerated, the other parent absent or created conditions causing child to be in need of aid, and incarcerated parent has not made adequate arrangements for the child), AS 47.10.011(6) (child has suffered or is at substantial risk of suffering substantial physical harm as result of parent's conduct), and AS 47.10.011(8) (child has suffered or is at substantial risk of suffering mental injury as result of parent's conduct). Martin challenges all three bases for the trial court's child in need of aid finding. Be-

**15.** See O.R. v. State, Dep't of Health & Soc. Servs., 968 P.2d 93, 98 (Alaska 1998) (holding that state is not required to wait for actual harm to child before intervening on the basis of AS 47.10.011(6) due to parental neglect).

**16.** In re J.A., 962 P.2d 173, 178–79 (Alaska 1998).

**17.** 962 P.2d 173 (Alaska 1998).

**18.** Id. at 178 (quoting Lane v. Jefferson County Child Welfare Unit, 564 S.W.2d 130, 132 (Tex. Civ.App.1978), overruled on other grounds by In re B.B. and P.B., 971 S.W.2d 160 (Tex.Civ.App. 1998)).

Martin's reckless use of firearms, including shooting Hannah when she was pregnant with Amanda, shows that he would pose a significant risk of harm to Amanda in the future. Finally, and contrary to Martin's argument, it is irrelevant that much of the testimony comes solely from Hannah, because the trial court found her to be a credible witness, and we generally defer to the trial court on the issue of witness credibility.[19] We affirm the finding of the superior court.

### b. AS 47.10.011(8): substantial risk of mental harm

■ Alaska Statute 47.10.011(8) provides in part that a child may be found in need of aid if "conduct by or conditions created by the parent ... have ... (B) placed the child at substantial risk of mental injury as a result of (i) a pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior that would, if continued, result in mental injury." The superior court found that the pattern of domestic violence described above constituted such terrorizing behavior "that would, if continued, result in mental injury to [Amanda]."

Martin's arguments regarding this subsection are essentially the same ones that he raises above: that Hannah is not a reliable witness, that his acts have never injured Amanda herself, and that his prior acts have not yet placed Amanda at risk. The statute itself directs the court to the question of whether the child would be mentally injured if the behavior is "continued," thereby contemplating an analysis of future harm similar to that in subsection .011(6). As discussed above, the trial court's factual findings were amply supported by the record, and we agree that Martin's acts constitute terrorizing behavior. We have previously held that witnessing domestic violence is mentally harmful to children.[20] There was clear and convincing evidence that Martin's acts toward Hannah create a significant risk of mental injury to Amanda if continued.

### 2. Alaska Statute 47.10.088(a)(1)(B): Martin did not make sufficient progress remedying the conduct or conditions likely to cause harm.

■ Alaska Statute 47.10.088(a)(1)(B) requires the trial court to find by clear and convincing evidence either that the parent has not remedied his or her harmful conduct or conditions, or that the parent has failed to make enough progress within a reasonable time such that there is still a substantial risk of harm to the child. The superior court found by clear and convincing evidence that Martin had not remedied his violent conduct and anger management problems, because Martin "compiled an impressive list of infractions while incarcerated based on his violent and confrontational behavior, to the point that he [was] in administrative segregation," and was thus unable even to obtain treatment for his poor anger management skills. Martin protests the trial court's finding that he committed infractions while in prison, arguing that the nature of his infractions was admitted over hearsay objections. But Martin himself admitted to disciplinary problems and confrontations while in prison. When this testimony is taken together with the testimony of Hannah and the social worker that Martin threatened them while he was in custody, the evidence is clear and convincing that Martin did not remedy his behavior and did not make sufficient progress under AS 47.10.088(a)(1)(B).

In determining under AS 47.10.088(a)(1)(B) whether a parent has remedied his or her conduct, we also consider factors relating to the best interests of the child.[21] Martin argues that he was not given reasonable time to control his problems, did well until visitation with Amanda was cut off, and will be in jail for a sufficient length of time to be substantially improved when he is released. The guardian *ad litem* responds that a decade is not a reasonable period of time to remedy his behavior based on Amanda's age

**19.** See, e.g., Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 66 P.3d 1, 8 (Alaska 2003).

**20.** J.A., 962 P.2d at 178; Borchgrevink v. Borchgrevink, 941 P.2d 132, 140 (Alaska 1997).

**21.** AS 47.10.088(b).

or needs.[22] We agree. Amanda was not yet two years old at the time of trial, and her need for permanency must reasonably limit the length of time accorded to Martin to remedy his behavior. The legislature has found that children under six years of age suffer tremendously when their bonding processes are interrupted, such that "it is important to provide for an expedited placement procedure to ensure that all children, especially those under the age of six years, who have been removed from their homes are placed in permanent homes expeditiously."[23] By the time the trial ended in April 2002, Amanda had been in foster care for eighteen months, three months more than the upper limit set in AS 47.10.088(d)(1)[24] for the final disposition of a child's CINA placement. We affirm the trial court's finding that Martin had not remedied his conduct within a reasonable time.

### 3. Alaska Statute 47.10.088(a)(2): DFYS made reasonable efforts to provide family support services to Martin.

■ Alaska Statute 47.10.088(a)(2) requires the court to find by a preponderance of the evidence that DFYS has made reasonable efforts to assist the parent in remedying harmful conduct or conditions, as required by AS 47.10.086. The superior court found that DFYS did all it could reasonably do until its efforts were excused by Martin's long sentence. Martin argues that DFYS's efforts were unreasonable because it delivered only the first case plan to him, a case worker met with him in person only once, and later case plans required further classes and good behavior even after he had been placed in maximum security. But we agree with the trial court that DFYS drew up a suitable case plan, including parenting classes and

drug monitoring, and implemented it through telephonic contact until March 2001 when Martin's maximum security status—which resulted from Martin's own actions while in prison—precluded him from taking further classes. DFYS also made reasonable efforts to provide Martin with visitation until it became clear that the visitation was harmful to Amanda. While Martin is in prison, the Department of Corrections rather than DFYS has primary responsibility for providing services to him;[25] after Martin was sentenced, the superior court was empowered to find that DFYS was not required to make efforts under AS 47.10.086(c)(10) because Martin was "incarcerated and ... unavailable to care for the child during a significant period of the child's minority." The superior court made this finding. The superior court did not err in finding that DFYS complied with the reasonable efforts requirement.

### 4. Alaska Child in Need of Aid Rule 18(c)(2)(C) and AS 47.10.088(c): Termination of Martin's parental rights was in Amanda's best interests.

■ The superior court found by a preponderance of the evidence under Alaska Child in Need of Aid Rule 18(c)(2)(C) that termination of parental rights was in Amanda's best interests. Martin disagrees and argues that it would be in the child's best interests instead to be gradually transitioned back into the care of her mother so that she could be raised by immediate family. But the question whether it would be in Amanda's best interests if Martin's rights were terminated is different from the question where Amanda's permanent placement should be. The court found that Martin "is an untreated violent offender with little pros-

22. AS 47.10.088(b) provides that in making a determination about whether a parent has remedied the conduct or conditions placing the child at substantial risk of harm, "the court may consider any fact relating to the best interests of the child, including (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs."

23. AS 47.05.065(5).

24. AS 47.10.088(d) provides in relevant part that "the department shall petition for termination of

a parent's rights to a child, without making further reasonable efforts, when a child is under the jurisdiction of the court under AS 47.10.010 and 47.10.011, and (1) the child has been in foster care for at least 15 of the most recent 22 months."

25. *A.M. v. State*, 945 P.2d 296, 305–06 (Alaska 1997), *superseded on other grounds by statute*, ch. 99, § 1, SLA 1998.

pect at present of learning to control his behavior," Amanda does not know him, and at nearly two years old, she was of an age at which it was important not to disrupt the bonding that had occurred between her and her foster parents. These findings met AS 47.10.088(c)'s requirement that "the court . . . consider the best interests of the child."

**B. The Trial Court Properly Denied Martin's Request To Stay the Termination Proceedings Pending Investigation of Placement of Amanda with Martin's Relatives Under AS 47.14.100(e).**

Martin claims that the trial court erred when it refused to stay his termination trial pending placement of Amanda with his relatives in Washington under AS 47.14.100(e), and in the alternative asks that Amanda be placed with his relatives whether his parental rights are terminated or not. The existence of relatives with whom Amanda might have been placed, a factor affecting DFYS foster placements under Title 47.14 of the Alaska Statutes, is unrelated to whether Martin's parental rights should have been terminated, a decision governed by AS 47.10.[26] Therefore there was no reason to stay his termination trial pending the out-come of that investigation. Moreover, we have recently held that "[i]n reaching its termination decision, the superior court was not required to revisit its earlier placement decision[,] and its termination order superseded all earlier placement orders."[27] If Martin or his relatives wished to challenge the placement of Amanda with a foster family, they could have done so by asking for internal DFYS review or by bringing the matter specifically to the superior court on its own merits;[28] but "the superior court's termination order now renders earlier issues of placement moot."[29] The superior court properly denied Martin's stay request.

## V. CONCLUSION

Because the superior court properly terminated Martin's parental rights under AS 47.10.088, and because placement issues were irrelevant to the termination proceeding, we AFFIRM the decision of the superior court.

---

26. *See, e.g., Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 10 (Alaska 2003) (holding that failure of DFYS to place child with relative does not entitle parent to reversal of termination order).

27. *Id.*

28. *Adoption of L.E.K.M.*, 70 P.3d 1097, 1101 & n. 12 (Alaska 2003); *Erica A.*, 66 P.3d at 10; *In re* W.E.G. & J.R.G., 710 P.2d 410, 413 (Alaska 1985).

29. *Erica A.*, 66 P.3d at 10.