*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, DEPARTMENT OF FAMILY & COMMUNITY SERVICES, OFFICE OF CHILDREN'S SERVICES, | ) ) ) ) | Supreme Court No. S-18500 |

STATE OF ALASKA, DEPARTMENT )
OF FAMILY & COMMUNITY )  Supreme Court No. S-18500
SERVICES, OFFICE OF )
CHILDREN'S SERVICES, )  Superior Court No. 3AN-22-00200 CN
)
          Appellant, )  O P I N I O N
)
   v. )  No. 7671 – November 17, 2023
)
KARLIE T. and GINO H., )
)
          Appellees. )

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Frank A. Pfiffner, Judge Pro Tem, and Adolf V. Zeman, Judge.

Appearances: Katherine Demarest, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellant. Julia Bedell, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellee Karlie T. Monique Eniero, Anchorage, for Appellee Gino H.

Before: Winfree, Chief Justice, and Maassen, Carney, Borghesan, and Henderson, Justices.

WINFREE, Chief Justice.

## I. INTRODUCTION

The Office of Children's Services (OCS) took emergency custody of a child within days of her birth. OCS then filed an emergency child in need of aid (CINA) petition in the superior court, seeking an order confirming probable cause to believe the

child was in need of aid and granting OCS temporary custody of the child pending further proceedings. The superior court held an evidentiary hearing and concluded that OCS had not shown probable cause to believe the child was a child in need of aid, and it then dismissed the CINA case. The superior court later denied OCS's reconsideration motion, and OCS then appealed. We reversed the superior court's decision in a short summary order (with an opinion to follow), remanding to reopen the CINA case and conduct further proceedings in the normal course. We now explain our order.

## II.    FACTS AND PROCEEDINGS

### A.    OCS's Assumption Of Emergency Custody And Its CINA Petition

Karlie T. and Gino H. are the parents of Cora T.,[1] born May 31, 2022. OCS took emergency custody of Cora directly from the hospital on June 3[2] and filed an emergency petition to adjudicate Cora as a child in need of aid and obtain temporary custody of Cora pending further proceedings.[3] OCS alleged that Cora was a child in need of aid under three provisions of AS 47.10.011.[4]

OCS cited ongoing concerns of domestic violence between the parents and their previous refusals to actively engage with OCS after prior contacts. The agency asserted that it had assumed emergency custody of Karlie's two older children in March

_____

[1]    We use pseudonyms to protect the family's privacy.

[2]    *See* AS 47.10.142 (providing for emergency custody of child in certain circumstances); CINA Rule 6 (implementing procedure for AS 47.10.142 emergency custody).

[3]    *See generally Miranda T. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 524 P.3d 1105, 1107-09 (Alaska 2023) (describing three early stages of CINA proceedings, including probable cause determination whether child may be in need of aid, an adjudication determination whether child is in need of aid, and a disposition determination for OCS's custody and placement of child in need of aid).

[4]    AS 47.10.011 provides that a court may determine a child is in need of aid if the child has been subjected to any of 12 enumerated situations.

2021 after Karlie was found "intoxicated, unconscious, and unresponsive" during a welfare check, leaving the children without "adequate supervision." It alleged that there had been domestic violence in Karlie's past relationships, and it described Gino's prior conviction for felony assault in 2017 based on evidence that he struck his young son. OCS summarized: "Due to [Karlie's] inability to recognize the ongoing domestic violence in her relationship, [Gino's] inability to recognize the ongoing domestic violence in his relationship, and [Cora] being a vulnerable infant, [OCS] is requesting temporary custody with removal at this time."

OCS noted that it believed Cora is an Indian child[5] under the Indian Child Welfare Act (ICWA).[6] Cora's Tribe later submitted an affidavit regarding Cora's tribal membership along with an intervention notice.[7] The superior court approved the Tribe's intervention and appointed a guardian ad litem for Cora.[8]

**B.     The Probable Cause Hearing And Underlying Facts**

The case was assigned to Superior Court Judge Adolf V. Zeman, but because he was unavailable the probable cause hearing was held before Superior Court Judge Pro Tem Frank A. Pfiffner. For Cora to remain in OCS's custody, the court

_____

[5]     *See* 25 U.S.C. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

[6]     25 U.S.C. §§ 1901-1963. ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture[.]" 25 U.S.C. § 1902.

[7]     *See* 25 U.S.C. § 1911(c) (authorizing child's Tribe to intervene in state court child custody or protection proceedings).

[8]     *See* AS 47.10.050(a) (authorizing appointment of guardian ad litem when "it appears to the court that the welfare of a child in the [CINA] proceeding will be promoted by the appointment").

needed to make several findings, including, as relevant to this appeal, that probable cause existed to believe she was a child in need of aid under AS 47.10.011.[9]

OCS had alleged in its petition that Cora was a child in need of aid under AS 47.10.011(6), (9), and (10), as follows:

> (6) . . . there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent . . .[;]
>
> (9) conduct by or conditions created by the parent . . . have subjected the child or another child in the same household to neglect; [or]
>
> (10) the parent['s] . . . ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child . . . .

At the beginning of the probable cause hearing, the court allowed OCS to amend its petition to include allegations that Cora was in need due to parental conduct listed in AS 47.10.011(8):

> (8) conduct by or conditions created by the parent . . . [that] have
>
>     (A) resulted in mental injury to the child; or
>
>     (B) placed the child at substantial risk of mental injury as a result of
>
>          (i) a pattern of rejecting, terrorizing, ignoring, or corrupting behavior that would, if continued, result in mental injury; or

_____

[9]    *See* CINA Rule 6(b) (regarding necessity of probable cause to issue order for emergency temporary custody of child in need of aid); CINA Rule 10(c) (regarding necessity of probable cause for temporary custody order).   Probable cause "is established where reasonably trustworthy information would justify a prudent person's belief that the child is in need of aid."  *In re J.A.*, 962 P.2d 173, 176 (Alaska 1998). This essentially reflects "a fair probability or substantial chance," *id.* (quoting *Van Sandt v. Brown*, 944 P.2d 449, 452 (Alaska 1997)), less than the preponderance of the evidence showing required at an adjudication hearing, *see* CINA Rule 15(c).

(ii) exposure to conduct by a household member [as defined by domestic violence statutes] against another household member [that is a felony crime of domestic violence]; or

(iii) repeated exposure to conduct by a household member [as defined by domestic violence statutes] against another household member [that is a misdemeanor crime of domestic violence.]

The underlying facts OCS presented at the hearing to make these showings spanned back over five years and involved not only Karlie, Gino, and Cora, but also Karlie's older children and her and Gino's past partners.

## 1. Interactions between Karlie and Gino concerning to OCS

OCS asserted in its petition and at the probable cause hearing that a history of domestic violence exists between Karlie and Gino, focusing on three interactions: Gino breaking Karlie's bedroom window, Gino pulling Karlie's hair with enough force to leave a small bald spot, and Karlie scratching Gino's face during a dispute.

OCS called an Anchorage police officer to testify about a May 12, 2022 incident when Gino had called the police "stating that he was trying to get away from [Karlie]." The officer testified that he and another officer responded to Gino's call and that Gino "alleged that [Karlie] had scratched his face during an altercation." The officer said he observed "a red scratch mark" that was "underneath [Gino's] right eye on his right upper cheek area." The officer said he reviewed traffic camera footage showing the incident and that the footage showed:

> [T]hey were both walking in the road, walking eastbound. [He] was to the left of [her]. [She], at first, she tries to reach out, appears to, like, grab his left arm — or his right arm, on her left side. . . . [I]t doesn't appear to be in, like, an aggressive manner. He kind of shrugs away. He doesn't allow her to do that. They continue a couple of feet down the road. . . . [A] bit later, [she] reaches up with her hands towards the direction of [his] face."

The officer said he spoke to Karlie after the incident and that she told him "it was an argument over property pertaining to a bank card." The officer said Karlie "claimed to me her intention was to remove his hood from his head, but she said she accidentally scratched him in the process." Karlie then was arrested because of an unrelated warrant, but she later also was charged with "a misdemeanor [domestic violence] assault" for scratching Gino.

The officer testified that when Karlie learned she was going to be arrested on the outstanding warrant, "she then . . . claimed [Gino] broke her window. . . . I tried to ask her further questions . . . [but] she did not go into further detail about that." The officer also stated: "Later at the hospital . . . she also disclosed to me . . . [that] about one week prior there was another incident where she alleged [Gino] had pulled on her hair and caused a little bit of hair to pull out." He further stated that Karlie "pull[ed] up the back of her hair" and, although he "didn't see any redness or any visible injury" he saw "one spot . . . a very small section where there wasn't hair growing."

The officer testified that he had interacted with Karlie once prior to the May 12 incident. He said that in February 2022 Anchorage police received a call from "[a] woman I believed to be [Karlie's] mother" who was "claiming that [Karlie] was being abused by [someone]." He testified that when he went to Karlie's residence to speak with her, she "didn't appear to have any injuries" and she "claimed to me that there had been no disturbance, she wasn't being abused, and her mother was, basically, intoxicated and saying things [and] just being paranoid."

OCS's caseworker for Karlie's family testified that the foster parents for Karlie's older children reported "multiple occasions where [Karlie] had bruises on her, and they are concerned with domestic violence going on." That caseworker said it was her "understanding that the incident in May, as well as both parents' history, was a cause of concern for . . . [Cora's] safety." Another caseworker testified that Cora was "at impending danger of risk due to the parents' history and inability to control their

emotions." She stated that Cora "is a young vulnerable infant . . . [a]nd if the parents can't control their own behaviors and lash out towards each other, she's at risk."

### 2. Karlie's past conduct concerning to OCS

OCS contended that Karlie's past conduct contributed to its conclusion that Cora was at risk of mental and physical harm in Karlie and Gino's custody. OCS presented evidence about Karlie's two older children being removed due to Karlie's substance abuse, her past partners having abused her and her older children, her failure to complete counseling required in the case plan for her older children, and her refusal to report her partners' violence or protect her children from it.

The family caseworker testified that OCS had assumed custody of Karlie's older children after "a welfare check was done . . . [and] she was found intoxicated, and her children left without a caregiver." At OCS's request the superior court took judicial notice that the two older children had been found to be children in need of aid and had been removed from Karlie's custody. The caseworker, who had worked with Karlie and the two children's fathers, testified that the boy's father had bit and thrown the boy and asserted that the father has "a history of assault, as well as assault on [Karlie and the boy]." She also testified that the girl's father "is a known sex offender who was in prison for six years due to his sex offense." The caseworker explained that OCS "wants [Karlie] to engage in counseling services to work on the behaviors that lead her to a pattern . . . of unhealthy relationships." The caseworker stated that Karlie had engaged in most of the services called for in the case plan developed after her older children's removal, including "an integrated substance abuse assessment," "parenting classes," "healthy relationships classes," and an "outpatient program." But she expressed concern that Karlie "has not engaged with counseling services" set out in her case plan.

The caseworker further explained that OCS "has concerns with [Karlie's] ability to be a protective parent and to protect her children from domestic violence." She testified that OCS learned that Karlie "did report to the police officers that there

was domestic violence" between her and Gino in May, but that OCS "would like to have her report that [domestic violence] as soon as it happens, and be willing to work with providers such as police, in order to protect herself and her children." OCS's other witness summed up OCS's concerns by stating: "[I]f [Karlie] can't protect herself, she can't be relied upon to protect a vulnerable infant."

### 3. Gino's conduct and criminal convictions concerning to OCS

OCS presented evidence of Gino's criminal history and his unwillingness to engage with social services. The superior court admitted into evidence three past convictions. One was from March 2017, when Gino pleaded guilty to felony assault of a child under age 12 (requiring medical treatment).[10] He was sentenced to active and suspended jail time and three years of probation. The caseworker testified that during a case planning meeting with Gino in September 2022 they discussed this conviction and OCS's concerns, but Gino "didn't see that there was a problem with his history." The other convictions were entered after no contest pleas for misdemeanor assault[11] and unlawful contact with a crime victim in October 2020.[12] He was sentenced to 90 days in jail and three years' probation; both judgments ordered Gino to have no contact with a specified person.

The caseworker testified about Gino's refusal to engage with OCS's services. She said Gino told her "that he could have gone to anger management classes to avoid some or all his jail time, but . . . that he would rather go to jail than engage in services." She said that after her September 2021 meeting with Gino, she "continued to offer case planning meetings" and "maintained regular contact with him." She testified that from "November of [2021] to February" she "reached out to him multiple

---

[10]   AS 11.41.220(a)(1)(C)(i).

[11]   Anchorage Municipal Code (AMC) 08.10.010(B)(1).

[12]   AMC 08.30.115(A).

times . . . to schedule an in-person case planning meeting." But she said that Gino "mainly ignored my attempts to reach him" and "only responded periodically" to texts. She also said that in February 2022 she had a case planning meeting with Gino to discuss multiple services that OCS recommended for him, but that Gino informed her "that he does not know why he needs to engage in services, and that he does not see that there [are] any concerns with his ability to keep children safe." The caseworker concluded by stating that Gino's past assaults on a child and others and his refusal to engage in services directed to anger management and domestic violence prevention posed a risk of harm to Cora.

### 4. The superior court's ruling

The court issued findings and an order from the bench at the conclusion of the probable cause hearing. The court started by saying it would dismiss the case, telling OCS: "You don't have any probable cause, and there's no basis for removal." The court ordered that Cora be returned to her parents "before the end of the day." The court then explained its decision.

The court first stated that OCS had "basically abandoned all of [the] claims in the Petition, except you came up with a new one, which I allowed you to do," referring to the amended allegations regarding section .011(8). The court nonetheless did address the initial allegations of substantial risk of substantial physical harm under section .011(6) as well as the allegations of mental injury and substantial risk of mental injury under subsections .011(8)(B)(i) and (ii).

The court said it found "no behavior" by the parents like that described in subsection .011(8)(B)(i): "conduct or conditions created by the parent [that] have placed the child at substantial risk of mental injury as a result of a pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior that would, if continued, result in mental injury." The court further said it found "no evidence of exposure" to domestic violence between household members under subsection .011(8)(B)(ii). As for section

.011(6), the court said "there's no evidence that the child has suffered substantial physical harm and otherwise, there's no risk of — or there's no evidence of [domestic violence] other than this May 12th thing between these two parents." The court concluded by stating that "I just think . . . [OCS] ran scared because of this other case [with Karlie's older kids] and filed this case . . . without a legal basis to do so."

### 5. Denial of OCS's motion for reconsideration

OCS filed a motion for reconsideration of the court's order as it pertained to subsection .011(8)(B)(ii), asserting that the court had misinterpreted the provision to require that the child be directly and personally exposed to domestic violence. The parents each filed an opposition to the reconsideration motion. Judge Zeman denied the motion, stating: "Based on the language of AS 47.10.011(8)(B)(ii) and the applicable case law, the Court did not misapply the law." Referring to Judge Pfiffner's ruling, Judge Zeman concluded:

> [T]he Court properly considered the totality of the circumstances in finding there was not a fair probability or substantial chance that the child was a child in need of aid under the probable cause standard. Moreover, the Court did not misapply the law in determining the child had to actually be exposed to domestic violence under [subsection] .011(8)(B)(ii).

### 6. Appeal

OCS appealed the superior court's rulings that probable cause did not exist to believe that Cora is a child in need of aid under AS 47.10.011(6) and (8)(B)(i) and (ii). In our earlier order, we agreed with OCS that the superior court erred by not concluding there was probable cause under AS 47.10.011(6) and (8)(B)(i).

## III. STANDARD OF REVIEW

"Whether probable cause exists" to find that a child is in need of aid "is a mixed question of law and fact."[13] "We review the content of the superior court's findings for clear error."[14] "Absent clear error, this court will accept the factual findings of the lower court."[15] " 'Whether probable cause arises from [the] facts, however, is a purely legal question' that this court reviews de novo."[16]

## IV. DISCUSSION

### A. Overview

This appeal requires that we consider the following questions of statutory interpretation: what does "substantial risk" of substantial physical harm mean under AS 47.10.011(6); what does "substantial risk" of mental injury mean under AS 47.10.011(8)(B); and what does "exposure to conduct" mean under AS 47.10.011(8)(B)(ii)? Statutory interpretation is a question of law we review de novo in our independent judgment.[17]

"When determining a statute's meaning, we consider three factors: the language of the statute, the legislative history, and the legislative purpose behind the statute."[18] "The objective of statutory construction is to give effect to the intent of the legislature, with due regard for the meaning that the statutory language conveys to

_____

[13] *In re J.A.*, 962 P.2d 173, 175 (Alaska 1998).

[14] *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526 (Alaska 2013).

[15] *In re J.A.*, 962 P.2d at 175.

[16] *Id.* (quoting *Saucier v. State*, 869 P.2d 483, 484 (Alaska App. 1994)).

[17] *Cora G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 461 P.3d 1265, 1276 (Alaska 2020).

[18] *Id.* at 1277 (internal quotations omitted) (quoting *Alaska Ass'n of Naturopathic Physicians v. State, Dep't of Com., Cmty. & Econ. Dev.*, 414 P.3d 630, 634 (Alaska 2018)).

others."[19]  "We give unambiguous statutory language its ordinary and common meaning, but the 'plain meaning rule' is not an exclusionary rule; we will look to legislative history as a guide to construing a statute's words."[20]  "We have declined to mechanically apply the plain meaning rule when interpreting statutes, adopting instead a sliding scale approach:  'The plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be.'  We apply this sliding scale approach even if a statute is facially unambiguous."[21]

## B. "Substantial Risk" Of Harm In Both AS 47.10.011(6) And (8)(B)

### 1. Ordinary and common meaning

"In the absence of a [statutory] definition, we construe statutory terms according to their common meaning[;] [d]ictionaries provide a useful starting point for this exercise."[22]  "Substantial" is defined as "[r]eal and not imaginary; having actual, not fictitious, existence,"[23] or as "not seeming or imaginary:  not illusive."[24]  "Risk" is defined as "uncertainty of a result, happening, or loss; the chance of injury . . . ; esp., the existence and extent of the possibility of harm,"[25] and as "the possibility of loss,

_____

[19]     *Id.* (quoting *Heller v. State, Dep't of Revenue*, 314 P.3d 69, 74 (Alaska 2013)).

[20]     *Id.* (quoting *Heller*, 314 P.3d at 74).

[21]     *State, Dep't of Com., Cmty. & Econ. Dev., Div. of Ins. v. Alyeska Pipeline Serv. Co.*, 262 P.3d 593, 597 (Alaska 2011) (quoting *Gov't Emp. Ins. Co. v. Graham-Gonzalez*, 107 P.3d 279, 284 (Alaska 2005)).

[22]     *State v. Recall Dunleavy*, 491 P.3d 343, 359 (Alaska 2021) (alterations in original) (internal quotations omitted).

[23]     *Substantial*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[24]     *Substantial*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (3d ed. 2002).

[25]     *Risk*, BLACK'S LAW DICTIONARY (11th ed. 2019).  *See also Risk Assessment*, *id.* (noting that in family law risk assessment refers to process to determine likelihood that "a parent[] will harm a child" and that before removing a child from the

injury, disadvantage, or destruction: contingency, danger, peril, threat" or "someone or something that creates or suggests a hazard or adverse chance: a dangerous element or factor — often used with qualifiers to indicate the degree or kind of hazard[.]"[26]

One legal authority defining "substantial risk" is the Restatement (Third) of the Law Governing Lawyers. A comment to the Restatement's Basic Prohibition of Conflicts of Interest, referring to a conflict when "there is a 'substantial risk' that a material adverse effect will occur," states that "[i]n this context, 'substantial risk' means that in the circumstances the risk is significant and plausible, even if it is not certain or even probable that it will occur" and that the standard "requires more than a mere possibility of adverse effect."[27] Another legal authority is the tentative draft of the Restatement of the Law: Children and the Law, which defines "substantial risk" in the context of "civil child-protection proceeding[s]" based on "physical neglect."[28] It explains that "[t]o satisfy the substantial risk standard, there must be a strong possibility of serious harm, not simply a remote or insignificant possibility."[29]

_____

family "a risk assessment should be performed to determine the likelihood of the child's being harmed in the future").

[26] *Risk*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (3d ed. 2002).

[27] RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 121 cmt. c(iii) (AM. L. INST. 2000).

[28] RESTATEMENT OF THE LAW: CHILDREN AND THE LAW § 2.24(b) (AM. L. INST., Tentative Draft No. 2, 2019) (explaining that "[i]n a civil child-protection proceeding, a child is physically neglected when the child suffers serious physical harm or is exposed to a substantial risk of serious physical harm").

[29] *Id.* § 2.24 cmt. e ("The harm standard adopted in this Section includes the creation of a substantial risk of serious physical harm to a child. Actual harm need not occur. The focus is on the potential for the acts and omissions to lead to serious physical harm.").

Another very similar definition comes from Wyoming's child protection laws: " 'Substantial risk' means a strong possibility as contrasted with a remote or insignificant possibility."[30]   The three definitions align by recognizing that a "substantial risk" is more than a "mere possibility" or a "remote or insignificant possibility," although Wyoming characterizes a substantial risk as more likely to materialize than does the Restatement (Third) of the Law Governing Lawyers, describing such a risk as a "strong possibility."  Defining "substantial risk" as more than a mere or remote possibility aligns with relevant dictionary definitions of "substantial" as meaning "not imaginary," and "having . . . actual existence."

### 2.    Legislative purpose

The legislature has determined that "it is the policy of the state to strengthen families and to protect children from child abuse and neglect; the state recognizes that, in some cases, protection of a child may require removal of the child from the child's home."[31]  The current version of AS 47.10.011 took effect in 1998 after legislation[32] written in response to the Governor's Child Protection Review Team[33] became law.[34]  Governor Tony Knowles directly advocated for the child protection reforms contained in House Bill 375, writing:

> National statistics have shown Alaska has the highest rate of child abuse and neglect among all 50 states with 38

---

[30]    WYO. STAT. ANN. § 14-3-202(a)(ii)(C) (West 2023) (" 'Substantial risk' means a strong possibility as contrasted with a remote or insignificant possibility . . . ."); *see also* OHIO REV. CODE ANN. § 2901.01(A)(8) (West 2023) (" 'Substantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist.").

[31]    AS 47.06.030(2).

[32]    House Bill (H.B.) 375, 20th Leg., 2d Sess. (1998).

[33]    *See* Minutes, H. Fin. Comm., Hearing on H.B. 375, 20th Leg., 2d Sess. (May 2, 1998) (statement of Rep. Fred Dyson).

[34]    Ch. 99, § 18, SLA 1998.

substantiated cases for every 1,000 children in the state's population. These disturbing numbers have steadily increased since the 1980's along with increases in substance abuse and domestic violence. One abuse feeds another. The cycle must stop. We're shirking our greatest responsibility if we don't face this tragedy head on and demand the tools, laws and resources to put an end to it. [35]

The governor described the bill as making "many changes in Alaska law to protect children and prevent crime."[36] The "most significant" included "[u]pdating the child in need of aid laws to put children first and make sure every effort is made to reunify the family when appropriate[.]"[37]

During a House Finance Committee hearing on HB 375, Representative Fred Dyson said that the CINA reforms would "[a]llow[] for earlier intervention in cases of child abuse and neglect when the child is in a dangerous home." [38] He stated that the bill would "[m]ake[] child protection the highest priority for [OCS], even higher than 'family reunification' at the expense of child safety."[39] At that hearing Assistant Attorney General Susan G. Wibker testified that the bill would remove the word "imminent" from CINA's jurisdictional statute, which then referred to "imminent and substantial risk of harm" to children.[40] That change was in response to an audit

---

[35]    1998 H. Journal 2201-02.

[36]    *Id.* at 2202.

[37]    *Id.*

[38]    Minutes, H. Fin. Comm., Hearing on H.B. 375, 20th Leg., 2d Sess. (May 2, 1998) (statement of Rep. Fred Dyson).

[39]    *Id.*

[40]    *Id.* (statement of Susan G. Wibker, Asst. Att'y Gen.) Under the predecessor to the current version of AS 47.10.011(6), a child could be declared in need of aid upon a showing of "an *imminent and substantial risk* that the child will suffer such harm as a result of the actions done by or conditions created by the child's parent,

undertaken by the Kempe Center after a report that a young girl in State care had been sexually assaulted.[41] Wibker said that the Kempe Center reviewed a random selection of cases and advised that Alaska's statutes were written too narrowly and that social workers were handicapped in their ability to assess ongoing, high risk, and dangerous situations.[42] Wibker said that the Kempe Center had concluded that Alaska's laws were some of the most restrictive in all of the states, "resulting in children being left in dangerous situations."[43] At a Senate Judiciary Committee meeting, Assistant Attorney General Lisa Nelson, Chief of the Human Services Section of the Department of Law, testified that Senate Bill 272 (the companion bill to HB 375) "allows for earlier court intervention in cases of abuse and neglect and quicker placement of children into safe homes."[44]

### 3. Conclusion

"[T]he right to the care and custody of one's own child is a fundamental right recognized by both the federal and state constitutions."[45] This right implicates

_____

guardian, or custodian[.]"   *In re S.A.*, 912 P.2d 1235, 1237 (Alaska 1996) (quoting former AS 47.10.010(a)(2)(C) (1995)).

[41]   Minutes, H. Fin. Comm., Hearing on H.B. 375, 20th Leg., 2d Sess. (May 2, 1998) (statement of Susan G. Wibker, Asst. Att'y Gen.).

[42]   *Id.*

[43]   *Id.*

[44]   Minutes, S. Jud. Comm., Hearing on S.B. 272, 20th Leg., 2d Sess. (May 4, 1998) (statement of Lisa Nelson, Asst. Att'y Gen).

[45]   *Dennis O. v. Stephanie O.*, 393 P.3d 401, 407 (Alaska 2017) (quoting *J.M.R. v. S.T.R.*, 15 P.3d 253, 257 (Alaska 2001)); *Mariah B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 499 P.3d 1021, 1027 (Alaska 2021) ("And '[i]n cases involving issues of such fundamental importance as parents' rights to raise their children, it is imperative that the legal system act with great care to protect parties' rights.' " (quoting *Diego K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 411 P.3d 622, 628 (Alaska 2018))).

constitutional considerations of privacy[46] and liberty.[47] But we have also explained that "this right is not absolute" and that when "the best interests of a child require it, a state may terminate parental rights provided that the proper procedural safeguards are observed."[48] These considerations factor into our interpretation of "substantial risk," and we strive to balance the private interest in family autonomy with the state's interest in protecting children from harm.[49] Based on all the foregoing, we conclude that "substantial risk" in both AS 47.10.011(6) and (8)(B) refers to a threat of "substantial physical harm" or "mental injury," respectively, that is actual, significant, and more than a mere possibility, but that the threat need not be probable, nor imminent, to satisfy the statutes.

_____

[46]     *See Ravin v. State*, 537 P.2d 494, 500 (Alaska 1975) ("[T]he zone of privacy involves the area of the family[.]").

[47]     *Richard B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 71 P.3d 811, 831 (Alaska 2003) (explaining that child custody is "one of the most basic of all civil liberties," and recognizing that "the protections of the due process clause . . . should be accorded significant weight" (quoting *Flores v. Flores*, 598 P.2d 893, 895 (Alaska 1979))).

[48]     *Matthisen v. Matthisen*, No. S-11317, 2005 WL 1253497, at *8 (Alaska May 25, 2005).

[49]     *See* RESTATEMENT OF THE LAW: CHILDREN AND THE LAW intro. note (AM. L. INST., Tentative Draft No. 1, 2018) ("Parents living in poverty or in minority racial, ethnic, and religious communities may adopt child-rearing approaches that differ from mainstream practices and values but that do not pose a substantial risk of serious harm to their children. Limiting state intervention for child-protection purposes to parental conduct that threatens serious harm to children preserves the privacy of all families from unwarranted intrusion.").

### C.   "Exposure" In AS 47.10.011(8)(B)(ii)

#### 1.   Context

A child can be found in need of aid under three different subsections of AS 47.10.011(8)(B) if conduct or conditions created by a parent have "placed the child at substantial risk of mental injury as a result of":

> (i) a pattern of rejecting, terrorizing, ignoring, or corrupting behavior that would, if continued, result in mental injury;[50] or

> (ii) exposure to conduct by a household member [as defined by domestic violence statutes] against another household member [that is a felony crime of domestic violence]; or

> (iii) repeated exposure to conduct by a household member [as defined by domestic violence statutes] against another household member [that is a misdemeanor crime of domestic violence].[51]

Contrasting language in (8)(B)(i), (ii), and (iii) provides context for determining the meaning of "exposure" in (B)(ii). Specifically, subsection (B)(i) does not mention "exposure" with respect to the stated pattern of serious, but perhaps not criminal, misconduct; subsection (B)(ii) refers to "exposure" to stated felony domestic violence conduct; and subsection (B)(iii) refers to "repeated exposure" to stated misdemeanor domestic violence conduct.

---

**50**   *See Pattern*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (3d ed. 2002) (defining pattern as "a reliable sample of traits, acts, or other observable features characterizing an individual); *Terrorize*, *id.* (defining terrorize as "to fill with terror or anxiety: . . . to coerce by threat or violence: . . . to excite fear: rule by intimidation").

**51**   We have paraphrased the statutory references to specific domestic violence crimes for brevity, clarity, and convenience.

We have held numerous times that ongoing domestic violence can support a child in need of aid finding under subsection (B)(i).[52]  We also have held that the domestic violence does not have to be directed at the child if the court finds that the pattern of behavior, if continued, would create a substantial risk of mental injury to the child.[53]  And we have expressly confirmed that it is not necessary that the child witness or be present throughout the pattern of domestic violence at issue under (B)(i).[54]

Subsections (8)(B)(ii) and (iii) allow a court to find a child is in need of aid due to exposure to felony-level domestic violence or "repeated exposure" to misdemeanor-level domestic violence.  OCS asserts that the superior court erred by interpreting subsection (B)(ii) to require that a child actually be exposed to domestic violence to be found a child in need of aid.  According to OCS:

> The language of the statute does not require proof that the child has already been exposed to violence, but rather, that the child is "at substantial *risk* of mental injury as a result of

---

[52]     *See, e.g.*, *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 521-24, 532 (Alaska 2013) (affirming CINA finding under (8)(B)(i) when record showed father had severely beaten his wife, sexually assaulted his children and social guests, held his family hostage, and threatened to kill his family); *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1258 (Alaska 2010) (affirming CINA finding under (B)(i) based on substantial evidence of ongoing domestic violence between parents); *Winston J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 134 P.3d 343, 348 (Alaska 2006) (holding that father's assault of children's mother and long history of domestic violence supported CINA finding under (8)(B)(i)); *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 79 P.3d 50, 55 (Alaska 2003) (affirming CINA finding under (8)(B)(i) when father had seriously assaulted child's mother multiple times).

[53]     *See Martin N.*, 79 P.3d at 55 (holding that father's terrorizing behavior aimed at mother created significant risk of mental injury to child if continued).

[54]     *See Barbara P.*, 234 P.3d at 1257 (stating that "AS 47.10.011(8)(B)(i) does not require that the children be physically present when there is domestic violence").

. . . exposure" to violence. If the evidence supports a finding that the child is likely to be exposed to violence in her parents' care and that the violence would place her "at substantial risk of mental injury," subsection (8)(B)(ii) applies.[55] [Emphasis and alterations in original.]

The parents, on the other hand, argue that the superior court correctly interpreted "exposure to domestic violence" as requiring a child to see, hear, or otherwise perceive domestic violence.

OCS's interpretation of subsection (8)(B)(ii) is implausible and misstates the "risk" the statute is designed to address. "Exposure" is defined as "an act of exposing, laying open, or setting forth[;] . . . an act of subjecting to an experience or influence[;] . . . a condition of being exposed to danger or loss."[56] Although we "held that witnessing domestic violence is mentally harmful to children,"[57] subsection (8)(B)(ii) addresses the risk of mental injury due to exposure to domestic violence, *not* the risk of exposure to domestic violence. This distinction matters causally: a child is not rendered in need of aid under (B)(ii) when there is merely a substantial risk of observing felony-level domestic violence in the household, but rather when exposure to felony-level domestic violence subjects the child to a substantial risk of mental injury. The distinction is plainer when considering the requirement of "repeated exposure" to misdemeanor-level domestic violence to find a child in need of aid under subsection (B)(iii) — under OCS's view of subsection (8)(B), "repeated exposure" is meaningless.

_____

**55**    *Citing* AS 47.10.011(8)(B)(ii); *Philip J.*, 314 P.3d at 533.

**56**    *Exposure*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (3d ed. 2002).

**57**    *Martin N.*, 79 P.3d at 55 (citing *In re J.A.*, 962 P.2d 173, 178 (Alaska 1998) and *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 140 (Alaska 1997)); *see also Philip J.*, 314 P.3d at 533; *Cora G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 461 P.3d 1265, 1289 n.108 (Alaska 2020).

Karlie correctly captures the relationship between subsections (8)(B)(i) and (ii), contending that (B)(i) is intended to allow the court to make "a CINA finding based on a pattern of harmful behavior regardless of whether the child has yet experienced that behavior firsthand" while (B)(ii) "provides a separate vehicle under which a child can be found to be at risk of mental injury because of the child's direct 'exposure' to domestic violence between the child's parents." This interpretation reveals a harmonious whole while giving effect to all three provisions of subsection (8)(B).[58]

OCS asserts in its brief that our case law supports its position that subsections "(8)(B)(i) *and* (ii) can apply to children too young to have yet been exposed to the violence directly." (Emphasis in original.) But OCS misreads our prior decisions. In *Martin N.* we affirmed a child in need of aid finding under subsection 8(B)(i), not (8)(B)(ii), after noting that (8)(B)(i) looked to the future:

> [T]he trial court's factual findings were amply supported by the record, and we agree that Martin's acts constitute terrorizing behavior. We have previously held that witnessing domestic violence is mentally harmful to children. There was clear and convincing evidence that Martin's acts toward [the mother] create a significant risk of mental injury to [the child] *if continued*.[59]

---

**58**    *See Murphy v. Fairbanks N. Star Borough*, 494 P.3d 556, 564 (Alaska 2021) ("When construing a statute, we must, whenever possible, interpret each part or section of a statute with every other part or section, so as to create a harmonious whole." (alterations omitted) (internal quotations omitted) (quoting *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1127 (Alaska 2017))); *Homer Elec. Ass'n v. Towsley*, 841 P.2d 1042, 1045 (Alaska 1992) (stating "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quoting *Alascom, Inc. v. N. Slope Borough, Bd. of Equalization*, 659 P.2d 1175, 1178 n.5 (Alaska 1983))).

**59**    *Martin N.*, 79 P.3d at 55 (emphasis added).

In *Winston J.* we also affirmed a child in need of aid finding under subsection (8)(B)(i), not (8)(B)(ii). After noting that Winston argued that the superior court had erred by finding his children in need of aid under section .011(8), we quoted "in relevant part" subsection (8)(B)(i) when affirming the child in need of aid finding.[60] Likewise in *Barbara P.* we affirmed a child in need of aid finding under subsection (8)(B)(i), not (8)(B)(ii): after stating that "AS 47.10.011(8)(B)(i) does not require that the children be physically present when there is domestic violence" we further quoted that provision and drew upon *Martin N.* for our decision.[61]

Finally, although our decision in *Philip J.* was not as clear, in that case we also affirmed a child in need of aid finding under subsection (8)(B)(i), not (8)(B)(ii).[62] We first quoted the superior court's ruling that Philip's conduct placed the child "at substantial risk of mental injury as a result of exposure to domestic violence and repeat domestic violence," and cited in a footnote to AS 47.10.011(8)(B)(ii).[63] This might suggest that we affirmed the superior court's ruling on this basis. But in the next paragraph we addressed Philip's argument that the child was not in need of aid under subsection (8) because he never beat his wife after the child was born.[64] We rejected that argument because "the statute accounts for future harm based on one parent's past abuse of the other parent," borrowing reasoning from *Martin N.*, which had affirmed findings under AS 47.10.011(8)(B)(i).[65] We supported our statement that OCS "was

_____

[60] *Winston J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 134 P.3d 343, 348 (Alaska 2006).

[61] *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1257-58 (Alaska 2010).

[62] *Philip J.*, 314 P.3d at 533.

[63] *Id.* at 533 & n.81.

[64] *Id.* at 533.

[65] *Id.*

not required to wait until [the child] suffered harm to act" entirely by citing *Martin N.*[66] Our analysis affirming the child in need of aid finding under subsection (8) thus was drawn entirely from opinions affirming findings under (8)(B)(i), not (8)(B)(ii).

### 2. Conclusion

Based on the plain meaning of subsection (8)(B)(ii), its broader statutory context and contrasting language in (8)(B)(i), (ii), and (iii), and our existing case law, we conclude that a child must actually have been exposed to domestic violence to be found a child in need of aid under the subsection.

### D. Application To Contested Superior Court's Probable Cause Rulings

A child in need of aid finding under subsection .011(8)(B)(ii) requires that the child has been actually exposed to felony level domestic violence, creating a substantial risk of mental injury. It is undisputed that Cora was not actually exposed to domestic violence of any kind. Accordingly, we affirm the superior court's original conclusion, and the later denial of reconsideration of that conclusion, that there was no probable cause to find Cora was in need of aid under this subsection.

Neither section .011(6), regarding substantial risk of substantial physical injury, nor subsection (8)(B)(i), regarding substantial risk of mental injury from a pattern of terrorizing-like conduct, requires that a child in need of aid finding be based on a child's actual exposure to domestic violence. And, as we set out earlier, the "substantial risk" under either subsection refers to a threat that is actual, significant, and more than a mere possibility, but it need not be probable, nor imminent, to satisfy the subsections.

At the probable cause stage of this CINA case, the superior court was not tasked with making findings whether the child *was* in need of aid under section .011(6) or subsection (8)(B)(i). The court instead was tasked with determining whether the

---

[66] *Id.*

evidence presented established *probable cause to believe the child was in need of aid*, i.e., "a fair probability or substantial chance" that the child was in need of aid, under section .011(6) or subsection (8)(B)(i).[67]  This low probable cause threshold for a finding about substantial risk of harm compels us to disagree with the court's conclusions that OCS had not established probable cause under section .011(6) and subsection (8)(B)(i).

As to section .011(6), the superior court said "there's no evidence that the child has suffered substantial physical harm and otherwise, there's no risk of — or there's no evidence of [domestic violence] other than this May 12th thing between these two parents."  But there was relevant evidence of domestic violence other than the allegations about the May 12 incident, evidence that supported a probable cause determination about a substantial risk of physical harm to the child.  First, there was evidence of ongoing domestic violence between Karlie and Gino, specifically evidence about Gino breaking Karlie's bedroom window, Gino pulling Karlie by the hair with sufficient force to leave a bald spot, the May 12 incident when Karlie scratched Gino's face in public, and reports from the foster parents for Karlie's older children that Karlie often had bruises suggesting domestic violence.  Second, there was Gino's previous felony conviction for assault on his young son, along with another previous misdemeanor assault conviction.  Coupled with these convictions was testimony that Gino saw nothing of consequence arising from his convictions and refused to engage in any child protection services, to the point that he would rather go to jail than engage in services designed to protect his child.  Third, there was evidence that Karlie struggled with unhealthy relationships and protecting her older children from domestic violence

_____

[67]     *In re J.A.*, 962 P.2d 173, 176 (Alaska 1998) (quoting *Van Sandt v. Brown*, 944 P.2d 449, 452 (Alaska 1997)).

involving her partners. This evidence is sufficient to establish probable cause to believe the child was in need of aid due to substantial risk of substantial physical injury.

As to subsection (8)(B)(i), the superior court found "no behavior" by the parents fitting the terrorizing-like conduct described in the subsection. But the same evidence of ongoing domestic violence between Karlie and Gino and of Gino's history of violence, along with the evidence of Karlie's inability to protect herself and her children from abusive partners, suggests that domestic violence plays a role in defining the family's relationships. Although a close call, we reiterate that the superior court was tasked with making a probable cause determination, not a finding whether the child actually was in need of aid. The evidence is sufficient to establish probable cause to believe the child was in need of aid due to substantial risk of mental injury from continued domestic violence in the family.

## V.    CONCLUSION

We AFFIRM the superior court's conclusion that there was not probable cause to believe Cora was a child in need of aid under AS 47.10.011(8)(B)(ii). We REVERSE the superior court's conclusions that there was not probable cause to believe Cora was a child in need of aid under AS 47.10.011(6) and (8)(B)(i).